# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE: ESTATE OF BENNIE P. FARREN | ) | C.A. No. 8714-MA |
| _____ | ) | _____ |
| | ) | |
| PATRICIA A. MCGLAUGHLIN, as Successor Trustee of The Hercules Living Trust and Beneficiary of The Hercules Living Trust, | ) ) ) ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 9385-MA |
| | ) | |
| ANDREW P. FARREN, as Executor of the Estate of Bennie P. Farren under the Will of Bennie P. Farren, and in His Individual Capacity, | ) ) ) ) | |
| | ) | |
| Respondent. | ) | |

## OPINION

Date Submitted: October 23, 2015
Date Decided: January 19, 2016

A. Dean Betts, THE BETTS LAW FIRM, P.A., Georgetown, Delaware; *Counsel for Patricia A. McGlaughlin.*

Richard E. Berl, Jr., BERL & FEINBERG, Lewes, Delaware; *Counsel for Andrew P. Farren.*

**LASTER, Vice Chancellor.**

Andrew P. Farren is the executor for the estate of his father, Bennie P. Farren (the "Estate").[1] Under Bennie's will, after the payment of his funeral expenses and the other debts of his Estate, he bequeathed his former residence and other assets to a trust. The terms of the trust contemplated that Patricia A. McGlaughlin could live in Bennie's former residence for the rest of her life.

Rebecca W. Courson is Andrew's biological mother and Bennie's ex-wife. She filed a claim against the Estate based on a child support order entered by a Florida court in 1986 and modified in 1987. The total amount of her claim was $228,459.47, consisting of $24,300 in missed payments plus compound interest on the amounts due.

Andrew accepted his mother's claim as a valid debt of the Estate. His decision meant that the value of the Estate's debts exceeded its liquid assets, so he filed a petition to sell Bennie's former residence to raise additional funds. If his petition is granted, then McGlaughlin will not be able to continue living in Bennie's former residence. At the age of 77, she would have to leave the place she has called home for nineteen years.

McGlaughlin objected to Andrew's decision and opposes his petition. She contends that Courson first had to register the Florida court's orders with the Delaware Family Court, then have the Family Court determine the amount of the arrearage. Only then, she says, could Courson have made a claim against the Estate. In this case, because the deadline for filing claims against the Estate has passed, Courson loses out. With her

---

[1] This decision refers to multiple members of the Farren family, so it uses their first names to avoid confusion. No disrespect is intended.

1

claim foreclosed, the Estate has sufficient liquid assets to pay its debts, and there is no need to sell the property.

In addition to opposing Andrew's petition, McGlaughlin filed a petition of her own. She seeks to remove Andrew as executor, contending that by accepting his mother's claim, Andrew breached the fiduciary duties that he owes to the Estate and its beneficiaries.

The parties cross-moved for summary judgment on their respective petitions. This decision grants Andrew's motion in part, holding that the Florida orders constituted a final judgment entitled to full faith and credit under the United States Constitution. Although Courson had the option to register the orders with the Family Court and have that court calculate the amount due under the orders, she was not required to follow that course as a prerequisite to asserting a claim against the Estate.

Otherwise, Andrew's motion is denied. Andrew has not provided an affidavit calculating the amount of interest due on the arrearage in accordance with Florida law. Until he does so, this court cannot determine the amount of the Estate's debts. Moreover, a trial is necessary so that the court can hear evidence, consider the equities involved in ordering a sale of a residence, and potentially craft a more tailored form of relief.

McGlaughlin's motion for summary judgment is denied. There is evidence which might suggest that Andrew favored his mother by accepting her claim and by requesting security, but the evidence is not sufficient to support judgment as a matter of law. A trial is necessary to weigh the evidence and evaluate Andrew's credibility.

# I.     FACTUAL BACKGROUND

The facts are drawn from the affidavits and supporting documents that the parties submitted in connection with their motions for summary judgment. For Andrew's motion, the factual record is evaluated in McGlaughlin's favor. For McGlaughlin's motions, the factual record is evaluated in Andrew's favor.

## A.     Bennie's Family History

Bennie and Courson were married, then separated in the late 1970s. During the marriage, they had two sons: Troy, born on August 5, 1969, and Andrew, born on July 23, 1974. After the separation, Bennie did not have any meaningful involvement in his sons' lives.

In the mid-1980s, Bennie developed a relationship with McGlaughlin. They never married, but they lived together for nearly thirty years. In 1997, they moved into a house at 161 Lakeside Drive in Laurel, Delaware (the "Residence"). Bennie bought the Residence and held title in his own name. During his relationship with McGlaughlin, Bennie became close to her grandson, Jared Smith.

## B.     Bennie's Child Support Obligations

By order dated July 29, 1986, the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida (the "Florida Court") required that Bennie pay Courson child support in the amount of $750 per month until Troy turned eighteen. The Florida Court required that from then on, Bennie pay Courson child support in the amount of $375 per month until Andrew turned eighteen. The first support payment was due on August 1, 1986. The order is titled "Final Order of Custody and Support" in Case No. 84-1266 (the

"Child Support Order"). The Child Support Order also directed Bennie to pay an award of legal fees to Dana H. Hankins, Courson's attorney, in the amount of $9,500.

By order dated January 29, 1987, the Florida Court modified the terms of the Child Support Order (the "Modification Order"). The Modification Order reduced Bennie's on-going support obligation to $300 per month, effective as of February 1, 1987, and continuing until further order of the Florida Court.

Bennie did not satisfy his obligations under the Child Support Order or the Modification Order. By order dated May 15, 1987, the Florida Court held Bennie in contempt for "willfully failing and refusing to obey" its orders and imposed a sanction of 364 days in jail. When the Florida Court issued its orders, Bennie lived in Delaware. McGlaughlin testified in deposition that Bennie knew about the orders, but that he never returned to Florida and did not serve any jail time.

In 1990, Bennie declared bankruptcy. As part of that proceeding, the amount Bennie owed Hankins was reduced to $4,254.13. The proceeding did not alter Bennie's child support obligations.

Although Bennie did not comply fully with the Child Support Order, he did make some child support payments. McGlaughlin submitted a Florida Court document titled "Family Law Case History" and dated February 9, 2015. It provides a history of the child support payments that Bennie made and reflects (i) a payment of $3,300 on December 31, 1985, (ii) payments of $300 on January 9, 1986, February 7, 1986, March 11, 1986, April 7, 1986, June 3, 1986, and June 13, 1986, (iii) a payment of $178 on November 12, 1986,

4

and (iv) an "adjustment" of $178 on August 27, 2013. The Family Law Case History reflects total arrears of $24,122.

C.      **Bennie's Death And The Administration Of The Estate**

Bennie died on September 12, 2012. His last will and testament (the "Will") named Ronald Farren, his brother, as his executor with Andrew named as the successor executor. For unknown reasons, Ronald declined to serve. Andrew took on the role, and the Sussex County Register of Wills granted him letters testamentary on October 3, 2012.

In his Will, after the payment of the debts of his Estate, Bennie bequeathed all of his assets, including the Residence, to the Hercules Living Trust (the "Trust"). The terms of the Trust permitted McGlaughlin to live in the Residence for the rest of her life, rent free, with the Trust funding the monthly expenses for the Residence. After McGlaughlin died, ownership of the Residence would pass to Smith. The Trust's other assets would pass to Troy and Andrew. McGlaughlin currently serves as the trustee of the Trust.

After funeral costs, taxes, and administrative expenses, the Estate had approximately $27,000 in net liquid assets plus title to the Residence. On December 4, 2012, Hankins filed a claim against the Estate for $4,254.13 plus interest, representing the legal fees that she had been awarded in the Child Support Order as modified in Bennie's bankruptcy proceeding. On January 2, 2013, Andrew rejected the claim, believing that Hankins would not pursue it. He was right. Hankins dropped the matter.

On February 4, 2013, Courson filed a claim for $228,459.47 (the "Arrearage Claim"). The total amount comprised child support arrearages of $24,300 plus compound interest on the missed payments totaling $204,159.47 through December 31, 2012.

To support the claim, Courson provided the Child Support Order, a table showing the statutory interest rates applicable under Florida law from 1981 through 2013, and a document from the Florida Court called an arrearage affidavit. Under Florida law, an arrearage affidavit presumptively establishes the amount due under a child support order. Courson submitted an arrearage affidavit dated January 18, 2013, which identified an arrearage of $24,300 (the "January Affidavit"). Although it did not refer to the Child Support Order or the Modification Order explicitly, the January Affidavit bore the same case number as the child support action. Courson also submitted a schedule prepared by a certified public accountant which calculated the amount of interest due using Florida's statutory interest rates. Courson did not submit a copy of the Modification Order, but her accountant's schedule accurately reflected the modified amount.

By letter dated February 15, 2013, Andrew informed McGlaughlin that he intended to accept the Arrearage Claim on behalf of the Estate unless McGlaughlin agreed to fund all of the costs that the Estate would incur in disputing it. McGlaughlin responded by asking Andrew to resign as executor so she could take over and dispute the Arrearage Claim. Andrew declined.

By letter dated June 5, 2013, Andrew informed McGlaughlin that he had caused the Estate to accept the Arrearage Claim. He also told McGlaughlin that the Estate would need to sell the Residence to raise the funds to pay its debts. As an alternative, Andrew proposed that McGlaughlin "forward funds sufficient to pay the claim, or mortgage the property to generate cash." Andrew advised McGlaughlin that unless she provided the funds, the Estate would "proceed in Chancery" to obtain permission to sell the Residence.

6

**D.     This Litigation**

On July 10, 2013, Andrew filed an action seeking authority to sell the Residence (the "Sale Proceeding"). As an exhibit to his petition, he provided an inventory of assets that identified (i) the Residence, valued at $176,000, and (ii) $48,732.07 in other assets, including $32,898.76 in cash. As debts, he identified (i) $13,920 for funeral expenses, (ii) $718.62 for taxes owed to Sussex County; and (iii) $228,459.47 for the Arrearage Claim. Andrew also identified $6,479.98 for expenses of estate administration.

McGlaughlin opposed the Sale Proceeding, contending that the Estate had sufficient liquid assets to pay all of its debts other than the Arrearage Claim. She argued that the Arrearage Claim was not based on a foreign judgment entitled to full faith and credit under the United States Constitution. She contended instead that the Child Support Order and the Modification Order needed to be registered with the Family Court and then reduced by that court to a final judgment.

During the Sale Proceeding, McGlaughlin obtained a second arrearage affidavit dated August 27, 2013 (the "August Affidavit"). Like the January Affidavit, it bore the case number of the child support proceeding, but it also referenced the Child Support Order and the Modification Order. The August Affidavit placed the amount of the arrearage at the marginally lower figure of $24,122. The Family Law Case History that McGlaughlin submitted showed that the Florida Court made an account adjustment in August 2013 to reflect an additional payment of $178 that had not been credited properly to Bennie's account. Because the August Affidavit is more recent, specifically references the Child Support Order and the Modification Order, and identifies a lower amount that

7

favors McGlaughlin, this decision adopts its figure of $24,122 as the principal amount of Bennie's unpaid child support obligation.

On February 24, 2014, McGlaughlin filed a separate proceeding to remove Andrew as executor (the "Removal Proceeding"). McGlaughlin alleged that Andrew had breached his fiduciary duties to the Estate and its beneficiaries by accepting the Arrearage Claim without sufficient proof and without conducting a meaningful investigation.

The two proceedings were assigned to a Master in Chancery. On April 15, 2014, the parties cross-moved for summary judgment in the Sale Proceeding. On July 15, 2014, McGlaughlin moved for summary judgment in the Removal Proceeding. The Master in Chancery heard argument on the motions together. During the hearing, Andrew's counsel agreed that based on authority submitted by McGlaughlin's counsel, Florida law did not authorize compound interest on past due child support payments. He represented that the amount of the past due payments plus simple interest still meant that the Estate's debts far exceeded its assets such that the Residence should be sold.

The Master issued a report recommending that the petition to sell the Residence be denied without prejudice because the Arrearage Claim was not valid until the Child Support Order and the Modification Order had been registered by the Family Court and reduced to a final judgment by that court. At that point, Courson would be free to re-file her claim, subject to the obvious timeliness defense that the Estate would have. The Master also recommended that Andrew be removed as executor because he breached his fiduciary duties by accepting the invalid Arrearage Claim.

## II. STANDARD OF REVIEW

"[J]udges in the Court of Chancery have both inherent and statutory power to refer any matter within the court's jurisdiction to a master." *DiGiacobbe v. Sestak*, 743 A.2d 180, 181 (Del. 1999). "The master is not a judge, however, so the master's rulings and report are not final until they have been reviewed and adopted by a judge." *Id.* This court reviews the master's factual and legal findings *de novo*. *Id.* at 184.

## III. LEGAL ANALYSIS

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Ct. Ch. R. 56(c).

> [T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party. When that is the state of the record, it is improper to grant summary judgment.

*Cont'l Oil Co. v. Pauley Petroleum, Inc.,* 251 A.2d 824, 826 (Del. 1969). The court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the evidence that it is desirable to inquire into or develop the facts more thoroughly at trial in order to clarify the law or its application.[2]

---

[2] *See, e.g., Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918-19 (Del. 1965)*; Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962); *Phillips v. Schifino*, 2009 WL 5174328, at *1 (Del. Ch. Dec. 18, 2009); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 1998 WL 731660, at *3 (Del. Ch. Oct. 9, 1998).

The threshold issue for decision is whether the Arrearage Claim was a just debt of the Estate. If it was not, then the Estate has sufficient liquid assets to satisfy its debts and there is no need to sell the Residence. The validity of the Arrearage Claim also affects whether Andrew should be removed as executor. McGlaughlin contends that Andrew breached his fiduciary duties because the Arrearage Claim was invalid and he nevertheless accepted it, thereby favoring his mother's interests over those of the Estate and its beneficiaries. If the claim was valid, then that contention loses much of its force.

## A.     The Validity Of The Arrearage Claim

Under Delaware law, "[a]ll claims against a decedent's estate which arose before the death of the decedent" are barred unless presented to the estate "within 8 months of the decedent's death." 12 *Del. C.* § 2102(a). To present a claim, "[t]he claimant may deliver or mail to the personal representative a written statement of claim indicating its basis, the name and address of the claimant and the amount claimed, or may file a written statement of claim, in the form prescribed by rule of the Court of Chancery, with the Register of Wills." *Id.* § 2104(1).

Following presentment, the executor of an estate can accept the claim or reject it. If the executor accepts the claim, then the executor will pay the claim in accordance with its statutory priority. *See id.* § 2105. "Child support arrears or retroactive support due as of the date of the decedent's death" are third in priority, junior only to the surviving spouse's statutory allowance and the estate's obligation to pay the decedent's funeral expenses. *Id.* § 2105(a)(3). Child support arrearages take precedence over "[t]axes imposed by the State," which are sixth in priority. *Id.* § 2105(a)(6). Other forms of money

10

judgments against the decedent, which includes "judgments before justices of the peace and decrees of a court of equity against the decedent for the payment of money," are eighth in preference. *Id.* § 2105(a)(8).

If the executor rejects the claim, then "[t]he claimant may commence a proceeding against the personal representative . . . within the time limited for presenting the claim." *Id.* § 2104(b)(2). With minor exceptions not relevant here, a rejected claim "shall be barred forever unless an action or suit be commenced thereon within 3 months after the executor or administrator has notified the claimant of such rejection." *Id.* § 2102(c).

The materials submitted in connection with the parties' cross-motions for summary judgment establish that the Arrearage Claim was validly presented as a claim against the Estate. Courson complied with the statutory requirements for presentation by filing the Arrearage Claim with the Register of Wills. Rather than only providing a description of the claim, as required by statute, she submitted supporting documentation that included the Child Support Order on which her claim was based, the January Affidavit bearing the seal of the Florida Court, a calculation by a certified public accountant of the interest due based on Florida's statutory interest rates, and a schedule of the applicable rates. Because Bennie did not have a surviving spouse, the Arrearage Claim ranked second in priority of payment, junior only to the Estate's obligation to pay Bennie's funeral expenses. *See id.* § 2105(a)(3).

Once Courson filed her claim, Andrew had to decide whether to accept or reject it. The materials submitted in connection with the cross-motions for summary judgment establish that he correctly accepted it. Under the Full Faith and Credit Clause of the

United States Constitution, "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. As a matter of federal law, "[t]he records and judicial proceedings of any court of any . . . State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738 (the "Full Faith and Credit Act"). As a matter of Delaware law, a judgment entered by a court in a sister state "has the same effect and is subject to the same procedures, defenses and proceedings for reopening, vacating or staying, as a judgment of the Superior Court of this State and may be enforced or satisfied in like manner." 10 *Del. C.* § 4782. Under these provisions, a Delaware court must give a foreign judgment the same force and effect that it would be given by the rendering court. *See Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 615-16 (Del. 2013). An executor like Andrew similarly must recognize the effect of a foreign judgment. Andrew therefore properly accepted the claim based on the Child Support Order and the arrearage affidavit.

McGlauglin contends otherwise. She cites three factors which she thinks made it improper for Andrew to accept the Arrearage Claim. First, she argues that although a *judgment* from another jurisdiction might be entitled to full faith and credit, the amount McGlaughlin sought "has never been reduced to a judgment by any court in the country, including, but not limited to, any Florida court or any Delaware court." Dkt. 22 at 7. As McGlaughlin sees it, only a final judgment can give rise to a claim against an estate. Second, she argues that the Child Support Order and the Modification Order have "never

been registered as a foreign support order in the State of Delaware." *Id.* In McGlaughlin's view, only after those orders are registered with the Family Court can Courson enforce them. Third, McGlaughlin objects that the amount Courson claimed "far exceeds the amount the Florida court said was owed ($24,300.00 v. $228,459.47 claimed)." *Id.* According to her, the amounts due under the Child Support Order do not bear interest, and to the extent they do, this court cannot quantify the amount.

None of these arguments provide a basis for rejecting the Arrearage Claim. The Arrearage Claim is a valid claim against the Estate, which Andrew correctly accepted. The only remaining issue is the amount of interest, which this court can determine after receiving supplemental submissions.

### 1. Assuming That The Arrearage Claim Was Contingent, Andrew Still Could Accept It.

In her first argument against the Arrearage Claim, McGlaughlin contends that the claim was invalid because it was not based on a final judgment that identified a liquidated amount. That is wrong as a matter of Delaware law. There is no requirement that a claim be based on a judgment or any other court document. Rather, claims that can be asserted against an estate include those that are "due or to become due, absolute or contingent, liquidated or unliquidated, [and] founded on contract, tort, or other legal basis." 12 *Del. C.* § 2102(a). Confirming that a claim need not be liquidated in the form of a final judgment, the statutory section describing the information required to present a claim states:

> If a claim is not yet due, the date when it will become due shall be stated. If the claim is contingent or unliquidated, the nature of the uncertainty shall

be stated. If the claim is secured, the security shall be described. Failure to describe correctly the security, the nature of any uncertainty and the due date of a claim not yet due does not invalidate the presentation made.

*Id.* § 2104(1). If a claim had to rest on a final judgment for a liquidated amount, this section would be unnecessary. And confirming again that a claim need not be in the form of a final judgment for a liquidated amount, the statutory section addressing the three month time period for filing suit on a rejected claim states that

in the case of a claim which is not presently due or which is contingent or unliquidated, the executor or administrator may consent to an extension of the 3-month period, or to avoid injustice the Court of Chancery, on petition, may order an extension of the 3-month period, but in no event shall the extension run beyond the applicable statute of limitations.

*Id.* § 2104(b)(2). If a claim had to rest on a final judgment for a liquidated amount, there would be no need for this section either.

McGlaughlin also is wrong as a matter of federal law, which provides that a child support order does not have to be embodied in final judgment for a liquidated amount to be enforceable. Historically, the Full Faith and Credit Clause and the Full Faith and Credit Act did not fully address the interstate enforceability of child support orders because some jurisdictions (including Delaware) regarded those orders as interlocutory. For example, the Delaware Supreme Court noted in 1991 that "[j]udgments or orders which are not final, but modifiable, such as alimony and child support orders, do not technically fall within the purview of the full faith and credit clause." *Massey v. Ball*, 595 A.2d 390, 393 (Del. 1991). In 1994, to address the gaps created by patchwork state efforts, Congress adopted the Full Faith and Credit for Child Support Orders Act, which

14

provides that a state court "shall enforce according to its terms a child support order made

. . . by a court of another State." 28 U.S.C. § 1738B(a)(1).

Regardless, as a matter of Florida law, the Child Support Order constituted a series

of final judgments for specific, liquidated amounts. Florida law controls this issue

because the question of whether an order constitutes a final judgment is determined by

the law of the rendering jurisdiction.[3]

Under Florida law, "unpaid child support . . . is essentially recognized as a

judgment by operation of law."[4] By statute, Florida law provides that

> any payment or installment of support which becomes due and is unpaid
> under any support order is delinquent; and this unpaid payment or
> installment, and all other costs and fees herein provided for, become, after
> notice to the obligor and the time for response as set forth in this
> subsection, a final judgment by operation of law, which has the full force,
> effect, and attributes of a judgment entered by a court in this state for which
> execution may issue.

Fla. Stat. § 61.14(6)(a)(1). Under this statute, "child support obligations vest at the time

payments are due. Thus, accrued child support, or child support in arrears, become vested

rights of the payee and vested obligations of the payor." *Cortina v. Lorie*, 95 So.3d 467,

---

[3] *See Barber v. Barber*, 323 U.S. 77, 86 (1944) (holding that a judgment of another state's court is entitled to full faith and credit when the judgment is considered final under the laws of the rendering state); *Fid. Standard Life Ins. Co. v. First Nat. Bank & Tr. Co. of Vidalia*, 382 F. Supp. 956, 961 (S.D. Ga. 1974) ("The finality of the judgment of a state court, the enforcement of which is sought in another jurisdiction, depends on the law of the state in which same was originally entered."), *aff'd*, 510 F.2d 272 (5th Cir. 1975).

[4] *Vitt v. Rodriguez*, 960 So.2d 47, 48 (Fla. Dist. Ct. App. 2007); *accord Dep't of Health and Rehab. Servs. v. Atterberry*, 578 So.2d 485, 486 (Fla. Dist. Ct. App. 1991) ("Past due installments become judgments by operation of law.").

468 (Fla. Dist. Ct. App. 2012) (citations omitted). Because the right to receive the payment is a vested property right of the payee, she "is entitled to enforcement of the payments by legal process and by such equitable remedies as the trial court may determine to be appropriate or necessary." *Smithwick v. Smithwick*, 343 So.2d 945, 947 (Fla. Dist. Ct. App. 1977).

McGlaughlin's first objection to Andrew's acceptance of the Arrearage Claim is thus incorrect on multiple levels. As a matter of Delaware estate law, the claim did not have to be based on a final judgment. As a matter of federal law, the Child Support Order was enforceable even if did not constitute a final judgment. But regardless, as a matter of Florida law, the Child Support Order constituted a series of final judgments, one for each missed payment.

Faced with these authorities, McGlaughlin makes a final try. She observes that under the Florida statute, "past due installments only become a final judgment by operation of law *after notice to the obligor*," and she argues that there is no evidence of notice to Bennie. Dkt. 32 at 2-3. If true, that argument at most would suggest that the Child Support Order did not constitute a series of final judgments under Florida law. It does nothing to address the validity of the claim under Delaware estate law or as a matter of federal law. Regardless, the argument is untenable in light of McGlaughlin's testimony. During her deposition, she admitted that she and Bennie knew about the child support proceedings in Florida, including Bennie's ongoing obligations and the order finding him in contempt and ordering him to jail. She also noted that they had received documents from the Florida Court in the mail, including a transcript of proceedings in the

16

Florida action. There is no reasonable dispute of fact as to whether Bennie had notice. He did. McGlaughlin's first objection to Andrew's acceptance of the Arrearage Claim is therefore unfounded.

## 2. This Court Can Enforce The Support Order.

In her second argument against the validity of the Arrearage Claim, McGlaughlin posits that this court lacks jurisdiction to address any disputes relating to the claim because exclusive jurisdiction over child support orders lies with the Family Court. According to McGlaughlin, this means that Courson was obligated first to register the Child Support Order and the Modification Order with the Family Court, then have the Family Court determine the specific amount of the claim by calculating the amount of interest. McGlaughlin recognizes that this court has exclusive jurisdiction over estate matters, so she argues that after a detour to Family Court, Courson had to return to this court to enforce her claim. And she had to accomplish all of this within the abbreviated time frame provided for claims against the Estate. In my view, although Courson had the option of registering the orders with the Family Court, she did not have to take that route.

Addressing McGlaughlin's argument requires balancing competing allocations of jurisdiction. By statute, the Family Court has exclusive original jurisdiction in cases that involve "the education, protection, control, visitation, possession, custody, care, or support of children." 10 *Del. C.* § 921(3). The Family Court also has jurisdiction over all actions arising under Title 13, including

> the construction, reformation, enforcement and rescission of agreements made between future spouses, spouses and former spouses concerning . . . the payment of child support . . . and any other matters incident to a

17

marriage, separation or divorce. . . . [and] jurisdiction to resolve any issues resulting from the construction, reformation, enforcement or rescission of an agreement.

13 *Del. C.* § 507(a).

By statute, the Family Court is the locus for a non-exclusive procedure for enforcing child support orders issued by courts of other states. Under the Delaware Uniform Interstate Family Support Act (the "Family Support Act"), "[a] support order or income-withholding order issued in another state or a foreign support order may be registered in this State for enforcement." *Id.* § 6-601. To register an order, the party seeking registration provides a certified copy of the order, any modifications of the order, "[a] sworn statement by the person requesting registration or a certified statement by the custodian or the records showing the amount of any arrearage," and certain identifying information regarding the obligor. *Id.* § 6-602(a). Upon receipt, the Family Court "shall cause the order to be filed as an order of a tribunal of another state or a foreign support order." 13 *Del. C.* § 6-602(b). "[T]he actual act of registration of a foreign support order . . . [is] merely a ministerial duty of a clerk." *Pierce v. Higgins*, 531 A.2d 1221, 1225 (Del. Fam. Ct. 1987). Once registered, the order "is enforceable in the same manner and is subject to the same procedures as an order issued by a tribunal of this State." 13 *Del. C.* § 6-603(b). The Family Support Act states expressly that it "does not . . . provide the exclusive method of establishing or enforcing a support order under the law of this State." *Id.* § 6-104(b)(1). "Remedies provided by this chapter are cumulative and do not affect the availability of remedies under other law, including the recognition of a support order of a foreign country or political subdivision on the basis of comity." *Id.* § 6-104(a).

18

In contrast, this court has constitutional jurisdiction over matters falling within the domain of equity, including the administration of estates, wills and trusts, and the conduct of fiduciaries. *See* 10 *Del. C.* § 341; *Glanding v. Indus. Tr. Co.,* 45 A.2d 553, 558-59 (Del. 1945).

> [T]he instruction of executors and other fiduciaries is a jurisdictional field within which the Court of Chancery has historically operated. The instruction of executors in connection with the administration of estates is an extension of equitable jurisdiction originally exercised over trust and fiduciary relationships and, as such, is a part of the exclusive jurisdiction of the Court of Chancery. Even though the Legislature provides in another tribunal a remedy for matters formerly cognizable in a court of equity, that fact will not deprive equity of the jurisdiction it formerly exercised unless, by statute, a clear or express indication has been made of legislative intent to deprive equity of jurisdiction.

*Del. Tr. Co. v. Blackstone*, 81 A.2d 126, 133 (Del. Ch. 1951) (citations omitted). "Where jurisdiction in equity has become established, a statute creating a remedy at law or removing the obstacles at law on the existence of which equity jurisdiction was originally founded does not oust equity of that jurisdiction, unless the statute affirmatively discloses the legislative intent to make the legal remedy exclusive." *Boxer v. Husky Oil Co.*, 429 A.2d 995, 998 (Del. Ch. 1981).

The Court of Chancery also has statutory jurisdiction of matters relating to estates. This court has jurisdiction to adjudicate disputes over the inventory of an estate and its list of debts. *See* 12 *Del. C.* § 1911. Claims against a decedent's estate must be made against the personal representative and enforced in this court. *See id.* § 2102. A petition to sell real estate to satisfy the debts of an estate, which is what Andrew filed, likewise falls within this court's statutory jurisdiction. *See id.* § 2701. This court's jurisdiction also

19

extends to and embraces the distribution of the assets and surplusage of estates. *See id.* § 2331.

Given these various grants of authority, the adjudication of a claim against an estate based on a support order appears to me to be an area where this court and the Family Court can and should cooperatively exercise concurrent jurisdiction. The different grants can be largely harmonized in the first instance based on whether the party subject to the support order is still alive. As Judge Wakefield dryly observed in *Pierce*, a decision on which McGlaughlin relies heavily, the Family Court has "the authority to enforce its support orders against support obligors who are living." 531 A.2d at 1227. So if the party subject to the support order is alive, this court logically should defer to the Family Court. Once a support obligor is dead, however, the ability to grant relief falls "within the sole province of the Court of Chancery."[5]

A second situation when this court would defer to the Family Court is if the claim under the support order was contested and the issues implicated the Family Court's expertise. *See* Ct. Ch. R. 87 (providing for assignment or transfer of causes and matters by the Court of Chancery to the Family Court). An executor or administrator generally "stands in [the] decedent's shoes and has no greater or other rights or powers than the

---

[5] *Id.* at 1228. The same principle applies to other situations that typically fall within the jurisdiction of the Family Court, but where this court exercises jurisdiction once a party has died. *See D.B. v. N.E.*, 2011 WL 5346098, at *3 (Del. Fam. Ct. Jan. 31, 2011) (reasoning that Court of Chancery had jurisdiction over claim by wife to enforce stipulated separation agreement once husband died and claim had to be made against his estate); *B.V.C. v. M.A.W.*, 2008 WL 1948040, at *3 (Del. Fam. Ct. Jan. 28, 2008) (same); *Sklut v. Markessinis*, 1997 WL 297083, at *3 (Del. Fam. Ct. Feb. 28, 1997) (same).

decedent would have had if living." *Pierce*, 531 A.2d at 1226. The registration statute provides grounds on which the obligor "may seek to vacate the registration, to assert any defense to an allegation of noncompliance with the registered support order, or to contest the remedies being sought or the amount of any alleged arrearages." 13 *Del. C.* § 6-606(a). Although the initial act of registering a foreign support order is ministerial, the Family Court becomes substantively involved if a party contests the order. *See id.* § 6-606(c).

In my view, if the executor contested a support order on grounds that raised important questions of family law, then this court likely would stay the estate proceeding so that the Family Court could resolve the dispute. This is what happened in *Pierce*, where the decedent owed more than seven years' worth of child support payments that a New Jersey court had ordered him to pay. The mother filed a claim against the estate, but unlike the current case, the estate rejected the claim. The mother then filed a complaint in the Court of Chancery. In response to the claim, the estate raised numerous defenses, including family law issues that presented questions of first impression. Not surprisingly, this court stayed the mother's claim against the estate pending a determination of these issues by the Family Court. After the Family Court issued its decision, the parties returned to this court for purposes of the estate proceeding.

McGlaughlin reads *Pierce* more broadly as establishing a mandatory regime in which this court cannot exercise jurisdiction over any disputes involving a support order and an estate, no matter how incidental or ministerial. She interprets *Pierce* to require this court to dismiss any claim against an estate that is based on a child support order for lack

of jurisdiction pending a decision by the Family Court that reduces the claim to a final judgment specifying a sum certain. Only at that point would this court address the implications of the Family Court's order for the estate, and only if the claimant could timely file a claim based on the Family Court's order

Contrary to McGlaughlin's reading, nothing in *Pierce* mandates that litigants always take a connecting flight through Family Court rather than a direct flight through Chancery. The *Pierce* decision describes the registration process contemplated by the Family Support Act as optional—which by statute it is. For example, the *Pierce* court observed that the "support arrears which had accrued at the time of decedent's death constitute a valid claim which *can* be registered with this Court against the decedent's personal representative." *Id.* at 1227 (emphasis added). Elsewhere the court observed that registration "*can* occur against the personal representative of the deceased support obligor." *Id.* at 1225 (emphasis added). Nothing in *Pierce* suggests that the registration route *must* be followed, likely because the Family Support Act states expressly that it "does not . . . provide the exclusive method of establishing or enforcing a support order." 13 *Del. C.* § 6-104(b)(1). Ironically, the only reference to "exclusive jurisdiction" in *Pierce* was the decision's recognition of this court's exclusive jurisdiction over claims against the decedent's estate. 531 A.2d at 1228.

In this case, if Bennie were still alive and Courson sought to enforce the Child Support Order, then the action should proceed in Family Court.[6] This court would not be involved. Once Bennie died, however, the estate proceeding implicated this court's jurisdiction. At a minimum, at that point, this court gained concurrent jurisdiction over the issues relating to the Child Support Order and could decide the entire proceeding.[7]

If the Estate had rejected the Arrearage Claim, and if the Estate raised novel issues of family law that implicated the Family Court's expertise, then this court would defer to the Family Court and enlist its aid, as it did in *Pierce*. In the current case, however, the Estate accepted the Arrearage Claim, and McGlaughlin has not identified any objections to the claim that involve novel issues, much less novel issues of family law. McGlaughlin

---

[6] There is also precedent for enforcing a final judgment represented by a child support order in Superior Court. *See Sevison v. Sevison*, 396 A.2d 178, 182 (Del. Super. 1978) (giving full faith and credit to New Jersey decree ordering alimony and support and enforcing money judgment for arrearages).

[7] *See In re Estate of Getchell*, 1994 WL 469153, at *4 (Del. Ch. Aug. 4, 1994) (accepting jurisdiction over and deciding case that involved a dispute over the distribution of a deceased husband's deferred compensation plan pursuant to a separation agreement); *Calvin v. Calvin*, 1985 WL 22037, at *5 (Del. Ch. Aug. 19, 1985) (accepting jurisdiction over and deciding case that included claim for specific performance of separation agreement against estate of deceased husband); *Green v. Saulsbury*, 33 A. 623, 630 (Del. Ch. 1880) (holding that once the Court of Chancery acquired subject matter jurisdiction under the statute authorizing the sale of real property by an estate, the court had jurisdiction "to pass upon all matters, either legal or equitable, necessary and proper, to a just determination in respect to those matters"). *See generally D.B. v. N.E.*, 2011 WL 5346098, at *4-5 (collecting and discussing cases involving overlap between Family Court jurisdiction over family matters and the Court of Chancery's jurisdiction over estates).

has argued instead that the Child Support Order did not constitute a final judgment, which is an issue this decision already addressed. *See* Part III.A, *supra*.

McGlauglin also argued by analogy to the applicable statute of limitations that laches should bar the Arrearage Claim. This argument finds no support in Florida or Delaware law. Under Florida law, there is no statute of limitations on past due child support payments.[8] The matter does not end there, because the Full Faith and Credit Clause does not require that a Delaware court apply Florida's statute of limitations. Even when applying a different state's substantive law, a state can apply its own statute of limitations.[9] That option does not change the outcome in this case, because under Delaware law, "there is no statute of limitations as to judgments or actions on

---

[8] *See Jackmore v. Jackmore*, 71 So.3d 912, 913 (Fla. Dist. Ct. App. 2011) ("Florida does not have a limitations period for enforcement of alimony or child-support orders . . . ."); *Pyne v. Black*, 650 So.2d 1073, 1077 (Fla. Dist. Ct. App. 1995) ("Child support is enforceable by contempt proceedings or by a judgment for arrearages, and these remedies are not barred by the statute of limitations."); *Frazier v. Frazier*, 616 So.2d 575, 579 (Fla. Dist. Ct. App. 1993) ("As a general rule, proceedings to enforce periodic alimony and child support orders are equitable proceedings that are not barred by a statute of limitations in Florida.").

[9] *See Sun Oil Co. v. Wortman*, 486 U.S. 717, 722, 729 (1988) (holding that "Kansas did not violate the Full Faith and Credit Clause when it applied its own statute of limitations" to a foreign judgment, and noting that "[t]his Court has long and repeatedly held that the Constitution does not bar application of the forum State's statute of limitations to claims that in their substance are and must be governed by the law of a different State"); Restatement (Second) of Conflict of Laws § 118(2) (1971) ("A valid judgment rendered in a State of the United States may be denied enforcement in a sister State if suit on the judgment is barred by the sister State's statute of limitations applicable to judgments."); *see also* 10 *Del. C.* § 8121 (providing that when addressing a cause of action arising under the law of another state, a Delaware court will apply either its own statute of limitations or that of the other state, "whichever is shorter").

judgments."[10] That rule extends to claims to enforce judgments for child support arrears.[11] McGlaughlin's timeliness defense lacks merit.

McGlaughlin also disputes the amount of the Arrearage Claim, but as discussed in the next section, that issue merely requires determining the amount of interest, which this court does routinely. *See* Part III.A.3, *infra*. To the extent McGlaughlin relies on her contention that Andrew breached his fiduciary duties by favoring his mother's claim at the expense of his duties to the Estate's beneficiaries, that issue falls within this court's wheelhouse. *See* Part III.C, *infra*.

Under the circumstances, I do not believe there is a need to burden the parties with a trip to Family Court. More importantly, I cannot justify imposing on one of the judges in Family Court the burden of addressing an interest calculation that this court is equally equipped to resolve. The judges of the Family Court already carry heavy caseloads that require them to address factually intensive and emotion-laden disputes, often in matters

---

[10] *Guayaquil & Quito Ry. Co. v. Suydam Hldg. Corp.*, 132 A.2d 60, 66 (Del. 1957); *see also Gamles Corp. v. Gibson*, 939 A.2d 1269, 1272 (Del. 2007) (noting that in Delaware there is no "statute of limitations governing judgments or actions on judgments[,] . . . [but there is] a rebuttable common law presumption of payment after twenty years" (footnote omitted)).

[11] *B.K. v. A.M.K.*, 2010 WL 1444637, at *2 (Del. Fam. Ct. Feb. 19, 2010) (agreeing with previous Family Court decisions that Delaware has no statute of limitations for child support arrears and noting that "it is well established by Delaware Courts that the equitable doctrines of laches and estoppel do not apply in the context of child support"); *T.A.G. v. E.R.G.*, 2008 WL 4698526, at *3 (Del. Fam. Ct. Oct. 6, 2008) (noting the "absence of a statute of limitations for child support arrears" in Delaware and concluding that "[c]laims for child support arrears may be made long after the child reaches the age of majority"); *see also* 13 *Del. C.* § 517(c) ("[T]he obligation for payment of arrears or past due support shall terminate by operation of law when all arrears or past due support have been paid.").

where the parties lack the assistance of counsel. They hardly need to be assigned the additional task of doing math for this court.

### 3. The Amount Of The Claim

In her third objection to the validity of Arrearage Claim, McGlaughlin contends that the amount is uncertain. According to her, the documents Courson presented do not support a claim for $228,459.47 in child support arrears, and this court cannot determine the amount of the claim against the Estate. Determining the amount of the claim is actually a straight-forward issue of calculating interest. That is something this court routinely does.

Contrary to McGlaughlin's contention, Courson presented a claim that entitles her to more than $24,300 in principal (which this decision has reduced to $24,122 based on the August Affidavit). Under Florida law, by statute, a party owed past due support payments is entitled to "interest at the rate established in § 55.03 on all judgments for support." Fla. Stat. § 61.14(6)(d).

Courson retained a certified public accountant to calculate the amount of post-judgment interest, and he did so by applying the applicable Florida statutory rates. He erred by calculating compound interest, but that was not an unreasonable approach. Under Delaware law, this court often awards compound interest, having recognized that compound interest is standard for financial instruments and that "even passbook savings accounts now compound their interest daily." *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 926 (Del. Ch. 1999). By contrast, "[a]n award of simple interest allows the obligor to gain something of a cumulative advantage by delaying payment of its obligation." *ReCor*

*Med., Inc. v. Warnking*, 2015 WL 535626, at *1 (Del. Ch. Jan. 30, 2015). The "rule or practice of awarding simple interest, in this day and age, has nothing to commend it— except that it has always been done that way in the past." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 173 (Del. 2002) (internal quotation marks omitted).

During the briefing on the motions for summary judgment, however, McGlaughlin's counsel uncovered authority establishing that Florida law does not allow compound interest on child support arrears.[12] Andrew has conceded this point and agrees that the amount of the Arrearage Claim is not $228,459.47. That concession was responsible and does not mean there is no debt to be paid. It rather means that Courson is entitled to simple interest calculated in accordance with Florida law.

Under Florida law, however, calculating simple interest on past due support payments is not so simple. Section 55.03 of the Florida Code governs the calculation of interest on judgments and decrees. Between 1986 and Bennie's death, the Florida legislature amended the statute several times. In 1986, the operative version of the statute provided as follows:

> A judgment or decree entered on or after October 1, 1981, shall bear interest at the rate of 12% a year unless the judgment or decree is rendered on a written contract or obligation providing for interest at a lesser rate, in which case the judgment or decree bears interest at the rate specified in such written contract or obligation.

Fla. Stat. § 55.03(1) (1981).

---

[12] *See Melvin v. Melvin*, 391 So.2d 691, 692 (Fla. Dist. Ct. App. 1980); *Coggan v. Coggan*, 183 So.2d 839, 841 (Fla. Dist. Ct. App. 1966).

Under this provision, calculating interest was straightforward. A party determined a daily rate based on the annual interest rate of 12% per year, then applied the daily interest rate for the number of days beginning with the date of entitlement and ending with the date of payment. *See* Jerry Reis & Marc H. Brawer, *The Intersection of F.S. §55.03 and Florida Family Law: Statutory Interest Calculations for Past-Due Support Payments*, 87 Fla. B.J. 54, 54 (2013). Calculating interest on a judgment awarding support payments was more complex, because "each support payment missed is treated like a [separate] judgment with simple interest applied to each missed payment." *Id.* (footnote omitted). Under this system, "if there were 96 monthly payments past due, each past-due payment required an interest calculation . . . . [and then] the 96 results had to be summed." *Id.* But under the regime in place in 1986, the interest rate for each missed payment was the same (12%).

In 1994, the Florida legislature changed the fixed post-judgment interest rate to a variable rate based on the federal discount rate. *R.J. Reynolds Tobacco Co. v. Townsend*, 160 So.3d 570, 571 (Fla. Ct. App. 2015) (review pending). The 1994 version of Section 55.03 provided:

> On December 1 of each year beginning December 1, 1994, the Comptroller of the State of Florida shall set the rate of interest that shall be payable on judgments or decrees for the year beginning January 1 by averaging the discount rate of the Federal Reserve Bank of New York for the preceding year, then adding 500 basis points to the averaged federal discount rate. The Comptroller shall inform the clerk of the courts and chief judge for each judicial circuit of the rate that has been established for the upcoming year. The initial interest rate established by the Comptroller shall take effect on January 1, 1995, and the interest rate established by the Comptroller in subsequent years shall take effect on January 1 of each following year. Judgments obtained on or after January 1, 1995, shall use the previous

statutory rate for time periods before January 1, 1995, for which interest is due and shall apply the rate set by the Comptroller for time periods after January 1, 1995, for which interest is due. Nothing contained herein shall affect a rate of interest established by written contract or obligation.

Fla. Stat. § 55.03(1) (1995). The 1995 amendment did not specify whether the rate of interest on a judgment changed from year to year if the calculated rate changed, but in 1998, the Florida legislature amended Section 55.03 to confirm that it did not. The clarifying amendment added a subsection stating that "[t]he interest rate established at the time a judgment is obtained shall remain the same until the judgment is paid." Fla. Stat. § 55.03(3) (1998).

Under the regime in effect after 1995, calculating interest on a judgment awarding support payments still required a separate calculation for each missed payment, and at that point also required determining the interest rate payable during the year in which each payment was missed. Once determined, that interest rate remained fixed from the date of entitlement until the date of payment.

In 2011, the Florida legislature adopted the currently operative version of Section 55.03. Under the amended provision, rather than re-calculating the interest rate on an annual basis, Florida officials re-calculate it quarterly. Moreover, for most judgments, the interest rate now fluctuates from year to year based on the new rate (if any) that comes into effect on January 1. Fortunately for present purposes, the provision calling for a fluctuating rate excludes child support orders. The pertinent text of the statute states:

> (1) On December 1, March 1, June 1, and September 1 of each year, the Chief Financial Officer shall set the rate of interest that shall be payable on judgments or decrees for the calendar quarter beginning January 1 and adjust the rate quarterly on April 1, July 1, and October 1 by averaging the

discount rate of the Federal Reserve Bank of New York for the preceding 12 months, then adding 400 basis points to the averaged federal discount rate. The Chief Financial Officer shall inform the clerk of the courts and chief judge for each judicial circuit of the rate that has been established for the upcoming quarter. The interest rate established by the Chief Financial Officer shall take effect on the first day of each following calendar quarter. Judgments obtained on or after January 1, 1995, shall use the previous statutory rate for time periods before January 1, 1995, for which interest is due and shall apply the rate set by the Chief Financial Officer for time periods after January 1, 1995, for which interest is due. Nothing contained herein shall affect a rate of interest established by written contract or obligation.

(2) Any judgment for money damages or order for a judicial sale and any process or writ directed to a sheriff for execution shall bear, on its face, the rate of interest that is payable on the judgment. The rate of interest stated in the judgment, as adjusted in subsection (3), accrues on the judgment until it is paid.

(3) The interest rate is established at the time a judgment is obtained and such interest rate shall be adjusted annually on January 1 of each year in accordance with the interest rate in effect on that date as set by the Chief Financial Officer until the judgment is paid, except for judgments entered by the clerk of the court pursuant to ss. 55.141, 61.14, 938.29, and 938.30, which shall not be adjusted annually.

Fla. Stat. § 55.03 (2011). By virtue of the reference to Section 61.14 in subpart (3), child support orders are not subject to a fluctuating rate.[13]

Under the 2011 version of Section 55.03, determining the exact amount of interest due on a child support arrearage is slightly more complex. Each missed payment is

---

[13] For judgments that are not excluded, uncertainty exists as to whether the 2011 amendments applied retroactively to orders already in effect. The Florida Court of Appeals held in *Reynolds* that the statute did not apply retroactively. *See* 160 So.2d at 575. The court certified its ruling to the Florida Supreme Court, which accepted review. *See Townsend v. R.J. Reynolds Tobacco Co.*, 171 So.3d 124 (Fla. 2015) (TABLE). The Florida Supreme Court has not issued its decision, but because of the exclusion for child support orders, its ruling will not affect this case.

treated as a separate judgment. The rate that applies to that payment is the rate in effect when the payment is missed. Rather than determining the rate that applied for the year in which the payment was missed, the statute requires determining the rate that applied during the quarter in which the payment was missed. That interest rate is then applied on a daily basis, with simple interest calculated based on the number of days between the date when the payment is due and the date when payment is made.

In this case, each of Bennie's missed payments became a separate final judgment by operation of law between August 1, 1986 (when the Child Support Order became effective) and July 23, 1992 (when Andrew turned 18). During that period, the statutory rate was 12% per annum, or .03288% per day. To calculate interest, each missed payment is treated as a separate final judgment, with interest equal to .03288% multiplied by the amount of the missed payment multiplied by the number of days from the date due until the date of payment. The sum of the missed payments plus interest equals the total amount due. To favor McGlaughlin, this decision deems the adjustment of $178 that the Florida Court made on August 27, 2013, as reflecting a partial payment made by Bennie on August 1, 1986. In accordance with Florida law, the payment that Bennie actually made on November 12, 1986, will be credited first to reduce interest outstanding as of that date and second to reduce principal. *See Vitt v. Rodriguez*, 960 So.2d 47, 49 (Fla. Dist. Ct. App. 2007) (holding that where payments are made on past due support, they "must first be applied to . . . current child support installment[s] due, then to accrued and outstanding interest on . . . delinquent child support obligations, and finally to the principal amount due on unpaid child support").

Although the interest calculation has multiple steps, it is not an impediment to this court in determining the specific amount of the Arrearage Claim. Determining the amount of interest does not require anything dramatically different than what this court typically does when quantifying an interest award. McLaughlin's final objection is denied.

### 4. The Partial Grant Of Summary Judgment

Based on the foregoing analysis, summary judgment is granted in part to the extent of determining that the Arrearage Claim is a valid claim against the Estate. Further proceedings are necessary to determine the amount of interest due on the arrearage of $24,122 and hence the full value of the claim. Andrew shall submit an affidavit providing the calculation, supported by an Excel spreadsheet in native format. McGlaughlin shall have ten days to object to the calculation, after which Andrew shall have five days to respond to McGlaughlin's objection.

## B. The Petition To Sell The Property

In the Sale Proceeding, Andrew seeks an order permitting him to sell the Residence. Delaware law provides that

> [w]hen the personal estate of a decedent is not sufficient to pay the decedent's debts, the decedent's executor or administrator may present to the Court of Chancery of the county in which there is any real estate of the decedent a petition outlining such facts, and praying for an order for sale of the whole, or such part thereof, if the personal estate is not sufficient for that purpose.

12 *Del. C.* § 2701. The statute does not require the court to grant the relief sought. Whether and on what grounds to permit an executor to sell real estate is left to the

discretion of the court. *See In re Estate of Burton*, 59 A.2d 278, 280, 282 (Del. Orphans' Ct. 1948).

In this case, Andrew has moved for summary judgment authorizing him to sell the Residence. His motion is denied for two reasons. First, he has not yet fully quantified the Arrearage Claim. Second, there are competing equities that require a trial and potentially a more nuanced remedy than the one Andrew has demanded on summary judgment. McLaughlin is 77 years old. Creditors are entitled to their remedies, even when those remedies impose hardships on debtors, but it is not clear at this stage that a court of equity should enter an order that would deprive McLaughlin of her residence to satisfy a claim that has been outstanding and accruing interest since 1986. Doubtless Courson would like to have the money, and the debt is a valid and just obligation of the Estate. The question is timing.

Depending on the actual amount of the claim and other factors, such as the value of the Residence, a more equitable alternative to an immediate sale may be available. A less blunt remedy might condition a sale on McLaughlin having a right of first refusal on the Residence. Another option might be to defer a sale until McLaughlin's death, conditioned on McLaughlin paying monthly rent to the Estate equivalent to the aggregate monthly interest accruing on the Arrearage Claim. McGlaughlin testified during her deposition that she received approximately $300,000 in life insurance proceeds when Bennie died from policies on which she was the named beneficiary, so she has resources that could be deployed to protect her interest in the Residence.

Doubtless there are many more possibilities that could be envisioned or which counsel could present. After a trial on the merits, the court will be in a better position to determine whether and on what conditions a sale of the Residence should be permitted. Except for the determination that the Arrearage Claim is a just claim against the Estate, the cross motions for summary judgment in the Sale Proceeding are denied.

## C.    The Petition For Removal

Through the Removal Proceeding, McGlaughlin seeks an order removing Andrew from his position as executor. Here too, issues of fact preclude granting summary judgment.

McGlaughlin asserts four reasons why Andrew allegedly breached his fiduciary duties and should be removed as executor. First, he did not require Courson to comply with McGlaughlin's reading of what *Pierce* required by registering the Child Support Order and Modification Order with the Delaware Family Court. For the reasons set forth above, Courson did not have to take those steps. *See* Part II.A, *supra*. Summary judgment is not available on that basis.

Second, Andrew allegedly failed to sufficiently investigate the merits of the Arrearage Claim before accepting it. The record establishes that Andrew reviewed the documents that his mother submitted, which included the Child Support Order, the January Affidavit, and the certified public accountant's calculation of interest. He reviewed the Excel formulas that the accountant used to calculate the amount of interest, and he looked online to confirm that the interest rates for the years of arrearages were correct. He also spoke with legal counsel for approximately thirty to forty minutes to

evaluate the claim. Viewing the evidence in a light most favorable to Andrew, this level of investigation could well be found after trial to be adequate. It is true that Andrew made a mistake by accepting a calculation that erroneously included compound interest, but that was not a facially implausible thing to do, and his decision will not amount to a breach of fiduciary duty if he acted in good faith and with sufficient care. Whether Andrew did so hinges on factual issues that cannot be resolved at this stage.

Third, Andrew allegedly favored his mother's interests and put his personal views regarding the obligation to pay child support ahead of the interests of the Estate and its beneficiaries. During his deposition, Andrew admitted that he took it personally that his father did not pay child support and that he regarded his mother's claim as "a debt that needs to be paid." Dkt. 17 App. at A-28. As further support for her assertion that Andrew favored his mother's interests, McGlaughlin observes that Andrew rejected Hankins' claim against the Estate for counsel fees in the amount of $4,254.13 plus interest. Andrew's attorney informed Hankins that her claim was rejected because the statute of limitations had passed. Andrew testified that he thought Hankins had written off the claim and was unlikely to pursue an action in Delaware to collect such a small amount.

By arguing that Andrew had a fiduciary duty to dispute claims by the Estate's creditors to favor its beneficiaries, McGlaughlin advances a legal principle that is contrary to Delaware law. When evaluating claims and paying them in the order of preference established by statute, an executor operates under a "mandatory duty of paying demands against the deceased in a certain prescribed order." *In re Ortiz' Estate*, 27 A.2d 368, 372 (Del. Ch. 1942). Based on the statutory scheme, "it is plain that

[executors] owe a duty to pay the claims of creditors of the decedent." *Id.* In terms of the priority of claims against the estate, creditors take precedence over beneficiaries, who only are entitled to their bequests after the claims of creditors have been paid. *See* 12 *Del. C.* § 2312(b). Because of this structure, the executor of an insolvent estate may sue a beneficiary who received a preferential transfer from the decedent to recover the proceeds for the benefit of the estate's creditors. *Ortiz' Estate*, 27 A.2d at 373. Delaware's statutory scheme comports with the common law, which recognizes that "[r]ights of creditors are paramount to those of devisees and legatees" and that "[a] testator has no power to dispose of his property by will as to interfere with the rights and claims of his creditors." 6 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills*, § 59.1 at 409-10 (2005). "It is said that the rights of creditors of the testator vest at his death, and regardless of whether the will so directs, every bequest or devise is subject to be divested in part or in whole if required to satisfy testator's debts." *Id.* at 410-11 (footnote omitted).

The priority of creditors' claims established by Section 2105 and the general priority of creditors' claims over bequests means that in the event of a conflict between higher and lower-priority claimants, the interests of the higher priority claimants come first. The obligation of an executor to pay legacies only arises when the estate is first able to satisfy the higher priority claims of creditors. Indeed, by statute, "[p]ayment or delivery of any legacy may be refused if it is apparent that there are not assets for the purpose." 12 *Del. C.* § 2312(b).

Under these authorities, Andrew's statutory obligation as executor was to pay the valid claims of the Estate in the order of their statutory priority. *See id.* § 2105; *Ortiz'*

*Estate*, 27 A.2d at 372-73. As discussed previously, a creditor's claim does not have to be liquidated in the form of a final judgment for a specific amount. *See* Part II.A, *supra*. Andrew acted consistently with the requirements of Delaware law by treating the Arrearage Claim as taking precedence over Bennie's legacies, including his bequest of the Residence to the Trust.

McGlaughlin observes that despite accepting the Arrearage Claim, Andrew rejected Hankins' claim for attorneys' fees, which also was based on the Child Support Order. Hankins' claim appears to have been valid, and Andrew should have accepted it. If Andrew had considered the Arrearage Claim and Hankins' claim simultaneously, then he legitimately could have rejected the latter claim on the grounds that there were not assets to pay it. Under the statutory prioritization in Section 2105, the Arrearage Claim was a category three obligation that came before all other claims except the Estate's obligation to pay Bennie's funeral expenses. Hankins' claim for attorneys' fees was a money judgment, making it a category eight claim. Although Hankins' claim had priority over Bennie's legacies, it was junior to the funeral expenses, the Arrearage Claim, and the taxes owed by the Estate.

In fact, Andrew did not consider the Arrearage Claim and Hankins' claim simultaneously. He rejected Hankins' claim before receiving the Arrearage Claim, and he asserted that the statute of limitations barred Hankins' claim even though it had been reduced to judgment via the same order that he later would conclude provided proper support for the Arrearage Claim. It is not clear at this stage to what degree he thought the same statute of limitations defense might apply to the Arrearage Claim. In reality,

Delaware does not have a statute of limitations for judgments, so it should not have been a consideration for either claim, but to the extent Andrew thought it was a consideration, it should have been a consideration for both claims.

Andrew's differing treatment of the two claims provides some evidence that he favored his mother's interests when administering the Estate. Given the relative priority of the Arrearage Claim, it is not likely that Andrew breached any duty by favoring his mother's claim, because any assumed favoritism happened to track the claim's statutory priority. The evidence of disparate treatment is not sufficient to warrant granting summary judgment in McGlaughlin's favor. It does create a dispute of fact for trial regarding whether Andrew administered the Estate in good faith.

Finally, Andrew did not breach his fiduciary duties as a matter of law by asking McGlaughlin to provide security before he contested the Arrearage Claim. McGlaughlin contends that Andrew "attempted to financially blackmail" her by asking her to pay for the defense of the claim and later to provide funds to pay the claim. Dkt. 19 at 9. To the contrary, by statute, an executor is entitled to request security from the recipient of a bequest if the executor knows of claims against the estate and believes that the estate's assets will be insufficient to pay the claim:

> [A] personal representative, if the representative knows of any demand, whether outstanding or potential, shall not be obligated to pay or deliver a legacy or distributive share unless the person entitled shall, with sufficient security, become bound to the executor or administrator by a joint and several obligation, in a penalty double the value of the legacy or share, . . . for the payment of all the just demands and charges against the decedent's estate, and all legacies by the decedent duly given, without such share or legacy or part thereof, shall refund and pay to the executor . . . the sum or value of the legacy or distributive share, with interest, or such portion

38

thereof as justly and lawfully out to be contributed on occasion of such deficiency.

12 *Del. C.* § 2312(b).

Section 2312(b) "makes 'sufficient security' a condition precedent to delivery of a legacy upon the demand of the legatee." *May v. DuPont*, 216 A.2d 870, 873 (Del. 1966). "The security contemplated by § 2312 is for the protection of the creditors and the beneficiaries of the estate, of course; but it is also for the protection of the executors," who may be exposed to liability for paying bequests. *Id.* The statute authorizes the executor to demand security up to "double the value of the legacy or share." 12 *Del. C.* § 2312(b). This authority is permissive, and executors may require a different form of security. When considering whether to ask for security and what type to accept, executors "must decide whether the security shall be in the form of cash, securities, refunding bond or otherwise." *May*, 216 A.2d at 873. If they decide upon a bond, they also must decide "whether surety shall be required; if so, whether it shall be personal or corporate surety; and if personal, what protective steps shall be taken to assure the security's continued financial stability." *Id.* "The determination of security sufficient to safeguard [an executor] . . . , as well as to protect the creditors and beneficiaries of the estate, becomes a difficult and extraordinary problem for executors." *Id.* It necessarily requires the exercise of judgment.

In this case, Andrew did not ask McGlaughlin to provide security up to "double the value of the legacy or share." 12 *Del. C.* § 2312(b). He first asked only that she fund the legal fees to dispute the Arrearage Claim. He later asked only that she provide funds

equal to the amount of the Arrearage Claim. It is possible that by exercising his authority to request security Andrew might have acted for an improper purpose, and the fact that he requested security provides some, albeit weak, evidence to that effect. What seems far more likely is that Andrew correctly regarded the Arrearage Claim as a just debt of the Estate and requested security before committing the Estate's funds to contesting a valid claim. As with Andrew's disparate treatment of Hankins' claim, the evidence regarding the demand for security is insufficient to establish as a matter of law that Andrew breached his fiduciary duties. It rather presents an issue for trial.

## IV.     CONCLUSION

The Arrearage Claim is a valid claim against the Estate. Otherwise, the competing motions for summary judgment are denied. This court will retain jurisdiction going forward.