# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | | |
|---|---|---|---|
| IN THE MATTER OF THE ESTATE OF | : | C.A. No.: | 2018-0462-PWG |
| LILA MAY CHILDRES, deceased | : | | 2020-0928-PWG |
| | : | | Register of Wills No: 16219 |

## MASTER'S REPORT

Date Submitted: June 28, 2021
Draft Report: July 16, 2021
Final Report: August 2, 2021

Mitchell W. May, MAY & PERZA, P.A., Dover, Delaware, *Attorney for Charisse S. Stanley*

Rodney Lee Kirk, 4843 LeRoy Street, Rapid City, South Dakota, 57701, *Pro Se*

Cynthia Anne Goertz, n/k/a Cynthia Anne Kirk, 75 Greenview Drive, Dover, Delaware 19901, *Pro Se*

Kelli Childres Walton, 509 Sunnybrook Circle East, Ormond Beach, Florida 32174, *Pro Se*

**GRIFFIN, Master**

Pending before me are four related estate matters – exceptions to inventory and first accounting, exceptions to second accounting, petition for accurate accounting, and petition to sell real estate to pay debts. Four siblings are beneficiaries of their deceased mother's estate. Exceptions to the estate inventory and first accounting were filed jointly by a sister and brother. Exceptions to the second accounting were filed by the sister who filed the first exceptions and separately by another sister. The petition for accurate accounting was filed jointly by the brother and sister who filed the first exceptions against a third sister, the estate's personal representative. Finally, the estate filed the petition to sell the decedent's real property to pay estate debts, including a large expenditure for attorney's fees, which is opposed by the brother and sister who filed the first exceptions. The matters were consolidated for the purpose of trying them together. The factual and procedural background in this report covers all of the matters but findings in each matter are addressed separately below. I recommend that the Court grant the exception to the inventory related to decedent's coin collection and deny the remaining exceptions to the inventory. I also recommend that the Court deny the exceptions to the first and second accountings, and deny the petition for an accurate accounting. Finally, I recommend that the Court grant the petition to sell real estate to pay debts, and order that the real property and mobile home be sold

together and that the sister with a life estate be compensated proportionately for that interest. This is a final report.[1]

## I. Background[2]

Lila May Childres ("Decedent") executed her Last Will and Testament ("Will") on August 20, 2014.[3] In her Will, Decedent devised a life estate in her real property located at 3514 Irish Hill Road, Magnolia, Delaware ("Property") to her daughter, Charisse Stanley ("Charisse"), with proceeds from any sale of the Property by Charisse being shared equally by Decedent's children – Rodney Kirk ("Rodney"), Cynthia Kirk ("Cynthia"), Kelli Walton ("Kelli"), and Charisse.[4] Decedent devised her residuary estate, including real and personal property, to Rodney, Cynthia, Kelli, and Charisse, *per capita*.[5] She appointed Charisse as executor of her estate ("Estate").[6] Decedent died on February 26, 2018.[7]

---

[1] This report makes the same substantive findings and recommendations as my July 16, 2021 draft report. Exceptions were filed by Charisse Stanley requesting minor clarifications to the draft report and appropriate changes have been made in this final report. No other exceptions were filed.

[2] I refer to Charisse Stanley and the Estate's trial exhibits as "Est. Tr. Ex." and Rodney Kirk and Cynthia Kirk's trial exhibits as "Kirk Tr. Ex." Citations to the trial transcript are noted as "Trial Tr."

[3] Est. Tr. Ex. A.

[4] *Id.*, ¶ 2. I use first names in pursuit of clarity and intend no familiarity or disrespect.

[5] *Id.*, ¶ 5.

[6] *Id.*, ¶ 7. I use "executor" and "personal representative" interchangeably in this report.

[7] *In re Lila May Childres*, Kent County Register of Wills No. 16219 [hereinafter "ROW Action"], Docket Item ("D.I.") 1.

On June 27, 2018, Rodney and Cynthia filed the Petition for an Accurate Accounting ("Petition for Accounting") claiming that Charisse had breached her fiduciary duties as the personal representative and asking that she secure and account for all of the Decedent's assets which she controlled before and after Decedent's death.[8] On August 14, 2018, Charisse filed an answer to the Petition for Accounting, denying the claims.[9] On August 30, 2018, Rodney and Cynthia filed a reply in opposition to the answer, and Charisse moved to strike the reply on September 25, 2018.[10] The Court denied the motion to strike on November 2, 2018,[11] and on November 9, 2018, Charisse filed another answer addressing new items of concern contained in the reply.[12]

On October 31, 2018, Rodney filed a motion claiming Charisse's liability because of her late production of the Will to the Kent County Register of Wills and, on November 9, 2018, Charisse responded.[13] The parties initially agreed to engage in mediation but, on May 1, 2019, Charisse advised the Court that mediation had not

---

[8] *In re Estate of Childres,*, C.A. No. 2018-0462-PWG, [hereinafter "Pet. for Acct."], D.I. 1. They asked that she provide proof of fire insurance on the Property. *Id.*, at 4.

[9] In her answer, Charisse noted that she never acted as an agent for Decedent through a power of attorney and that she would file an accounting within the required period. *Id.,* D.I. 8.

[10] *Id.*, D.I. 9; *Id.*, D.I. 10.

[11] *Id.*, D.I. 13.

[12] *Id.*, D.I. 14.

[13] *Id.*, D.I. 12; *Id.*, D.I. 15.

occurred.[14]   On May 8, 2019, Rodney and Cynthia filed a motion to compel discovery, and Charisse responded to that motion on May 28, 2019.[15]   On July 30, 2019, Rodney and Cynthia filed a motion to grant relief on claims they filed against the Estate, with Charisse providing a response on August 9, 2019.[16]   In addition, Charisse filed a motion to compel discovery against Rodney and Cynthia on August 9, 2019.[17]   A hearing was held on the four outstanding motions on September 12, 2019, and the Court denied Rodney's motion for production of the Will, and Rodney and Cynthia's motions to compel discovery and to grant relief on claims against the Estate.[18]   The Court granted Charisse's motion to compel discovery, ordering that Rodney and Cynthia comply with discovery requests for production of documents and interrogatories within 30 days.[19]

On February 10, 2020, the parties participated in mediation, which was unsuccessful.[20]   On February 20, 2020, Rodney filed a motion to amend the Petition for Accounting to add claims of embezzlement and fraud against Charisse and

---

[14] *Id.*, D.I. 17.  Rodney and Cynthia separately confirmed that the mediation did not occur because they could not agree to the terms of the mediation set by the mediator. *Id.*, D.I. 19.

[15] *Id.*, D.I. 20; *Id.*, D.I. 24.

[16] *Id.*, D.I. 31; *Id.*, D.I. 33.

[17] *Id.*, D.I. 34.

[18] *Id.*, D.I. 36.

[19] *Id.* The Court, however, denied Charisse's requests that Rodney and Cynthia pay her attorney's fees related to all of the motions. *Id.*

[20] *Id.*, D.I. 43.

Decedent and to challenge the Will.[21]  The Court denied the motion to amend as futile on March 25, 2020.[22]

Charisse filed the Estate inventory ("Inventory") on May 16, 2018, and the first accounting for the Estate ("First Accounting") on May 31, 2019.[23]  On August 5, 2019, Rodney and Cynthia filed exceptions to the Inventory and, on August 9, 2019, they filed exceptions to the First Accounting.[24]  Charisse responded to the exceptions to the Inventory on September 4, 2019, and to the exceptions to the First Accounting on September 9, 2019.[25]  Charisse filed the second accounting for the Estate ("Second Accounting") on April 24, 2020.[26]  Cynthia filed exceptions to the Second Accounting on July 21, 2020 and Kelli filed exceptions to the Second Accounting on July 22, 2020.[27]  Charisse filed responses to both exceptions on August 19, 2020.[28]

---

[21] *Id.*, D.I. 44.

[22] *Id.*, D.I. 47.

[23] ROW Action, D.I. 3; Est. Tr. Ex. C.

[24] ROW Action, D.I. 22; *Id.*, D.I. 23.

[25] *Id.*, D.I. 24; *Id.*, D.I. 25.  At the September 12, 2019 hearing, the Court determined that there would be a joint hearing on the Petition for Accounting and on the Exceptions for the Inventory and First Accounting. Pet. for Acct., D.I. 36.

[26] Est. Tr. Ex. D.

[27] ROW Action, D.I. 27; *Id.*, D.I. 28.

[28] *Id.*, D.I. 29; *Id.*, D.I. 30.  The third accounting for the Estate was filed on April 4, 2021 but was not at issue during trial. *Id.*, D.I. 40.

5

On October 29, 2020, Charisse filed a Petition to sell the Property to Pay Estate Debts ("Petition to Sell Property").[29] She also filed a motion to consolidate the Petitions for Accounting and to Sell Property on October 30, 2020.[30] On November 20, 2020, having received no responses to the motion to consolidate, the Court ordered the consolidation of the Petitions for Accounting and to Sell Property, as well as the exceptions to the Inventory and First and Second Accountings, for the purpose of trying the matters together but kept the cases separate.[31] On November 25, 2020, Rodney filed a motion to reject the Petition to Sell Property and, on December 1, 2020, he moved to reject the motion for consolidation.[32] On December 1, 2020, Cynthia filed an answer to the Petition to Sell Property.[33] On December 7, 2020, Rodney filed a letter with the Court asking that the consolidation be rescinded and objecting to the conduct of the trial remotely by Zoom.[34] On December 17, 2020, the Court considered the merits of Rodney's untimely motion to reject consolidation, and declined to rescind the consolidation of the matters for the limited

---

[29] *In re Estate of Childres*, C.A. No. 2020-0928-PWG [hereinafter "Pet. to Sell Real Est."], D.I. 1.

[30] *Id.*, D.I. 3.

[31] *Id.*, D.I. 4.

[32] *Id.*, D.I. 6; *Id.*, D.I. 8.

[33] *Id.*, D.I. 9.

[34] *Id.*, D.I. 10.

purpose of trying them together.[35]  And, noting that Rodney did not provide specific reasons for his objection to a remote hearing, the Court confirmed the hearing would be conducted remotely unless the judicial emergency due to COVID-19 was no longer in place and the proceeding could be conducted safely in the courthouse.[36]

A two-day trial on all of the matters was held by Zoom on May 19 and 20, 2021.  On May 28, 2021, Charisse filed a statement detailing attorney's fees and costs incurred.[37]  Cynthia responded to the statement reiterating her position that the attorney's fees should be charged to Charisse and not the Estate, and Charisse replied on June 28, 2021.[38]  On June 22, 2021, Charisse submitted an appraisal of Decedent's coin collection.[39]

## II. Analysis

Findings and recommendations regarding each matter are detailed separately below.

### A. Exceptions to the Inventory

---

[35] *Id.*, D.I. 11.

[36] *Id.*

[37] Pet. for Acct., D.I. 65.

[38] *Id.*, D.I. 66; *Id.*, D.I. 71.

[39] Pet. to Sell Real Est., D.I. 24.

Court of Chancery Rule 198 specifies the burden of proof in exceptions to an inventory or accounting.[40] Once exceptions are filed in compliance with Rule 198, the burden of proof falls on the personal representative to demonstrate that the inventory or accounting was properly prepared.[41] Exceptions are addressed below.

1. <u>Value of real estate</u>: The Inventory lists the Property, including the 1987 mobile home, as real estate with a $50,000.00 value under Schedule A, and the mobile home again, with a value of $20,000.00, as personal property under Schedule E.[42] In their exceptions, Rodney and Cynthia contend that the $50,000.00 value for the real property listed on the Inventory is not a true market value,[43] and provided a desktop appraisal ("Desktop Appraisal") valuing the Property at $165,000.00 as of May 17, 2021.[44] They originally asserted that the mobile home is part of the real

---

[40] Ct. Ch. R. 198.

[41] *In re Est. of Stepnowski*, 2000 WL 713769, at *1 (Del. Ch. May 2, 2000) (this "burden of proof reflects the fact that the administrator of the estate stands in a fiduciary capacity to the beneficiaries"); *see also In re Est. of Rich*, 2013 WL 5966273, at *1 (Del. Ch. Oct. 29, 2013).

[42] ROW Action, D.I. 3.

[43] *Id.*, D.I. 22; *Id.*, D.I. 27.

[44] Kirk Tr. Ex. A. The Desktop Appraisal was designated a "limited appraisal analysis" and prepared without an internal or external inspection of the Property. It was based on the presumption that the mobile home had been retired and was classified as real estate by the Kent County Assessor's office. *Id.* In addition, the Property was valued as of May 17, 2021 and not February 26, 2018 (the date of Decedent's death).

property but, at trial, Cynthia claimed the mobile home was personal property.[45] Charisse originally argued that the mobile home on the Property was still titled through the Division of Motor Vehicles ("DMV") and, therefore, would be considered personal property under Schedule E.[46] But, at trial, she concluded that selling the Property and the mobile home together would maximize the overall value.[47] She further claims that the Inventory states her "best guess" of the value of the Property and the mobile home at the time the Inventory was filed, and that the Inventory will be amended to reflect the accurate value of the Property, including the mobile home, through the Estate's final accounting after the Property is sold.[48]

The first issue is whether the mobile home on the Property is personal property and should be listed on Schedule E or considered as part of the Property on Schedule A. Delaware law requires that an estate inventory value each parcel of real estate separately at its fair market value as of the date of death of the decedent.[49]

---

[45] Cynthia originally argued there was no title for the mobile home at Division of Motor Vehicles and it was on permanent foundation. ROW Action, D.I. 27, at 3. At trial, she claimed the mobile home was not part of the Property. Trial Tr. 98:5-7; Trial Tr. 99:3-5.

[46] ROW Action, D.I. 24, at 1.

[47] Trial Tr. 326:18-327:10.

[48] Trial Tr. 22:19-21; Trial Tr. 62:21-24; Trial Tr. 267:24-268:3.

[49] 12 *Del. C.* §1905(a).

In determining whether the mobile home is part of the real property, I focus on the Kent County Property Information for the Property ("KCPI"), which denotes the mobile home/improvement on the Property as a manufactured home and does not designate it as subject to a Class C assessment or with a retired title.[50] I am not persuaded by the opinion of Charisse's expert, Kevin Baird, Esquire, that the KCPI shows that the mobile home had been converted into real property.[51] I interpret the KCPI differently. In two separate places the KCPI designates the mobile home as a "MANUF HM" improvement on the Property and does not use the alternate designations of "MANUFCC," (which the KCPI improvement key indicates means that it is a "Manufactured Home Class C Assessment"), or "MNFHMRT" (which the KCPI improvement key indicates means it is a "Manufactured Home Retired Title," and has become part of the real property with its title retired by DMV).[52] Further, Charisse provided evidence of a DMV title to the mobile home that was issued to Decedent and Dennis on October 19, 1987 and remains in Charisse's possession.[53] The evidence does not show that the mobile home has become part of the real property. Therefore, the mobile home remains personal property of the

---

[50] Est. Tr. Ex. K.

[51] Trial Tr. 298:8-21.

[52] Est. Tr. Ex. K.

[53] ROW Action, D.I. 47, Est. Tr. Ex. Impeachment Ex. G. The title to a mobile home is typically returned to DMV when a mobile home is retired. *See* Trial Tr. 120:9-17.

Estate and should be listed in Schedule E of the Inventory. However, the practicalities of the situation (including the difficulty, if not impossibility, of moving an almost 35-year-old mobile home off of the Property in order to sell it) make it appropriate that any sale of the mobile home should be made in conjunction with the sale of the Property.

Second, I consider whether the Property was "valued at its fair market value as of the date of death of the decedent" in the Inventory. Given the lack of evidence before me concerning the value of the Property at the time of Decedent's death, I cannot infer, at this time, that the value of the Property on Schedule A is inaccurate, although it may be undervalued. The Desktop Appraisal assigns a value of $165,000.00 to the Property, including the mobile home, while the Inventory values the Property as $50,000.00.[54] The difference is substantial; however, the Desktop Appraisal's drawbacks – in particular, the absence of an inspection of the Property, the inclusion of the mobile home's value, and the focus on the Property's current value – limit its usefulness in determining the Property's value at Decedent's death more than three years prior to the appraisal. Based on the evidence before me, I decline to find that the Property's value listed on the Inventory did not represent its

---

[54] *See* Kirk Tr. Ex. A; ROW Action, D.I. 3.

11

fair market value at Decedent's death.[55]  Therefore, I recommend that the Court deny the exception claiming the value of the Property on the Inventory is inaccurate.

2.  <u>Stocks and bonds</u>:  The Inventory lists no stocks or bonds on Schedule B.[56] Rodney and Cynthia claim that there should be stocks and bonds.[57]  Charisse testified that Decedent owned no stocks or bonds at her death.[58]  At trial, Rodney and Cynthia presented no proof that Decedent owned any stocks or bonds at her death.  I recommend that the Court deny this exception.

3.  <u>Money in banks and owed to Decedent, gold bars</u>:  The Inventory lists no mortgages, notes or cash, including money in banks or owed to Decedent, in Schedule C.[59]  Rodney and Cynthia claim that Decedent had significant amounts of money in accounts at Discover Bank, Tyndall Federal Credit Union and Dover Federal Credit Union ("DFCU") at her death, and that Charisse owed Decedent money.[60]  Charisse contends that Decedent did not have any mortgages, notes, gold bars, or cash at the time of her death and that Decedent's accounts in Discover Bank,

---

[55] Since the Estate's administration will not be completed until after the sale of the Property to pay Estate debts (as discussed below), Charisse has the opportunity to amend the Inventory, if needed, to reflect the fair market value of the Property and the mobile home prior to the closing of the Estate.

[56] ROW Action, D.I. 3.

[57] *Id.*, D.I. 22; *Id.*, D.I. 27, at 3.

[58] Trial Tr. 24:6-8.

[59] ROW Action, D.I. 3.

[60] *Id.*, D.I. 22; *Id.*, D.I. 27, at 3.

12

Tyndall Federal Credit Union, and DFCU had named beneficiaries that were payable on death ("POD").[61] The evidence shows that the three accounts had named POD beneficiaries, so the money in those accounts passed to the beneficiaries outside of the Estate.[62] And, at trial, Rodney and Cynthia presented no evidence that Decedent had other cash, money in her banks accounts not accounted for, or monies owed to her. I recommend that the Court deny this exception.

4. Jointly owned property: The Inventory lists no jointly owned property on Schedule D.[63] Rodney and Cynthia argue that Decedent jointly owned the Property and the DFCU account with Dennis Childres ("Dennis"), her deceased husband.[64] Charisse responds that the Property and the DFCU account were jointly owned by Decedent and Dennis, but passed to her by operation of law upon his death on February 17, 2008.[65] Dennis' name may have remained on the deed to the Property

---

[61] *Id*., D.I. 24; Trial Tr. 25:12-26:17; Trial Tr. 50:8-17.

[62] *See* Est. Tr. Exs. L, M, N; 12 *Del. C.* §1901(c) ("If, under the terms of any . . . contract [such as a bank account], . . . a person . . . other than the decedent or the decedent's estate's personal representative, is designated to receive, upon or after the death of the decedent, any property or other death benefit, such property or death benefit shall not be included in the inventory of the decedent as chargeable to the decedent's personal representative").

[63] ROW Action, D.I. 3.

[64] *Id*., D.I. 22. Cynthia questions the validity of the account ownership and designations form, executed on October 11, 2016, adding Charisse as a joint owner and POD beneficiary of the DFCU account since the form does not include Dennis' name. *Id*., D.I. 27. Charisse placed a letter from a DFCU employee into evidence confirming that Charisse was the sole POD beneficiary of that account from October 11, 2016 until the account was closed. Est. Tr. Ex. L.

[65] ROW Action, D.I. 24.

13

and on the DFCU account after his death, but legal ownership of the jointly owned Property and DFCU account passed to Decedent when Dennis died, so Decedent was sole owner of both at the time of her death.[66]  I recommend that the Court deny this exception.

5.  Miscellaneous property:  The Inventory lists the mobile home (valued at $20,000.00), a car (valued at $8,000.00), and household furniture and appliances, paintings, jewelry box, riding lawn mower, and outdoor furniture and tools, totaling $34,650.00, on Schedule E.[67]  Rodney and Cynthia argue that the car should not be included because it is a liability, not an asset, of the Estate; life insurance should have been included on the Inventory; other items, including jewelry, watch, doll and coin collections, china, sterling silverware, and flea market stock, were not included; and all items should have been valued by an appraiser.[68]  Charisse counters that Decedent's car was repossessed and the remaining amount owed on the car loan is

---

[66] "It is well settled in Delaware that the title to real estate descends to the heirs or vests in the devisees immediately upon the death of the testator subject to be divested if it be necessary to sell it for the payment of debts of the deceased." *In re Est. of Morrell*, 1995 WL 783075, at *4 (Del. Ch. Dec. 26, 1995)) (citation omitted); *see also Dixon v. Joyner*, 2014 WL 3495904, at *4 (Del. Ch. July 14, 2014) ("title to real property passes by operation of law upon an owner's death").  There is no evidence that Decedent's interest in the Property was divested after Dennis' death.  And Dennis and Decedent's joint bank account would have passed directly to Decedent on his death. *See In re Est. of Kelter*, 1994 WL 698634, at *5 (Del. Ch. Sept. 19, 1994).  Further, Dennis' Last Will and Testament, dated May 3, 1996, devised all of his real and personal property and estate to Decedent. Kirk Tr. Ex. E.

[67] ROW Action, D.I. 3.

[68] *Id.*, D.I. 22; *Id.*, D.I. 27, at 4.

$4,444.17, as reflected in the August 7, 2018 claim filed by Wells Fargo Bank against the Estate.[69] She states that the elimination of the car's $8,000.00 value was addressed through the first accounting and the remaining car loan debt will be addressed in the final accounting.[70] Charisse further responds that any life insurance owned by Decedent had named beneficiaries and are not Estate assets, and denies that Decedent had jewelry other than costume jewelry at the time of her death, or other personal property not accounted for, or that she is required to obtain formal appraisals of Estate property.[71] Charisse submitted into evidence a complete list of Decedent's personal property, which she indicated she has retained, except for Decedent's clothes.[72]

      (a)  <u>Coin Collection</u>:  Rodney and Cynthia claim Decedent's coin collection is Estate property, while Charisse contends Decedent gave her the coin collection to hold to give to Decedent's grandchildren.

"Under Delaware law, to enforce an inter vivos gift, the plaintiff must establish (1) an intent, manifested by the donor, to make a gift, and (2) an actual or

---

[69] Ext. Tr. Ex. G. Charisse testified that she surrendered Decedent's 2016 Kia Soul to Wells Fargo Bank because of the $13,000.00 outstanding loan on the car, which exceeded the car's value by approximately $5,000.00. Trial Tr. 30:17-31:10.

[70] ROW Action, D.I. 24, at 2.

[71] *Id.*

[72] Est. Tr. Ex. J; Trial Tr. 46:22-47:5; Trial Tr. 49:13-50.

constructive delivery of the subject of the gift to the donee."[73]  "A gift *causa mortis* is usually defined as a gift of personal property made in expectation of the donor's death but which may be revoked by [her], upon condition that the donee shall be entitled to the property if the donor dies as expected and the donee survives [her]."[74]  "[T]here must be an actual or constructive delivery of the property to the donee, in order for a gift *inter vivos* or *causa mortis* to be valid and effective."[75]  "[D]elivery must occur during the donor's lifetime."[76]  "The donee has the burden of establishing, by clear and convincing evidence, all facts essential to the validity of a purported gift."[77]

---

[73] *Honaker v. Est. of Haas*, 2013 WL 1459196, at *2 (Del. Ch. Apr. 11, 2013); *see also Bothe v. Dennie*, 324 A.2d 784, 787 (Del. Super. 1974); *Coladonato v. Watkins*, 2007 WL 1874760, at *12 (Del. Super. June 5, 2007) ("The essential elements of a gift *inter vivos* seem to be a donor competent to make it; freedom of will on his or her part; an intention to make it; a donee capable of taking the gift; the gift must be complete and nothing left undone; the property must be delivered by the donor and accepted by the donee; the gift must go into immediate and absolute effect, must be gratuitous and irrevocable.") (citations omitted).

[74] *Coladonato*, 2007 WL 1874760, at *12 (citing *Hill v. Baker*, 102 A.2d 923, 926 (Del. Super. 1953). *See also Conforti v. Ignudo*, 1981 WL 318276, at *3 (Del. Ch. July 27, 1981) ("A gift causa mortis is the transfer of property made with a view of impending death."); *Trout v. Farmers' Tr. Co. of Newark*, 168 A. 208, 210 (Del. Ch. 1933) ("[T]here are certain necessary requisites for the validity of [a gift *causa mortis*]. The first and probably the most important of these is that it must be made in 'peril of death.'").

[75] *Coladonato*, 2007 WL 1874760, at *12 (citing *Hill,* 102 A.2d at 926); *see also Trout*, 168 A. at 210 (for a gift *causa mortis*, "actual delivery of the property must be made").

[76] *Bothe*, 324 A.2d at 787; *see also Conforti*, 1981 WL 318276, at *3 ("Like a gift inter vivos, a gift causa mortis must be delivered to the donee prior to death.").

[77] *Est. of Reed ex rel. Reed v. Grandelli*, 2015 WL 1778073, at *3 (Del. Ch. Apr. 17, 2015).

Charisse testified that Decedent, prior to her death, asked Charisse to give the coin collection to her grandchildren after she passed.[78]  Charisse admitted that she did not notify the grandchildren about the gift or take steps towards delivering the gift to the grandchildren.[79]  The evidence does not clearly show whether the gift was intended as a *inter vivos* gift or a *gift causa* mortis, which was revocable by Decedent during her lifetime.  Regardless, for either an *inter vivos* gift or a *gift causa* mortis, there must be delivery to the donee(s) during the donor's lifetime for the gift to be valid.  Here, the evidence is insufficient to show actual or constructive delivery of the coin collection to the donees – Decedent's grandchildren – during Decedent's lifetime.  The grandchildren had no knowledge of the gift.  The gift's validity has not been established by clear and convincing evidence, and I find that the gift is ineffective.  The coin collection is Estate property and must be included in the Inventory.[80]

(b)  Other:  With regard to Decedent's car, circumstances that occurred after the Inventory was filed (the car was surrendered to the bank holding the car loan) have eliminated Decedent's car as an asset of the Estate, and its elimination has been addressed through the First Accounting.[81]  The remaining car loan debt will

---

[78] Trial Tr. 47:20-21; Trial Tr. 142:24-143:1; *see also* Est. Tr. Ex. I.

[79] Trial Tr. 143:5-14.

[80] The value of the coin collection was appraised at $823.10. Pet. to Sell Real Est., D.I. 24.

[81] Trial Tr. 30:17-31:18; Trial Tr. 36:18-37:3; Est. Tr. Ex. C.

need to be satisfied prior to the closing of the Estate, and the debt accounted for in the final accounting.[82] In addition, payouts on Decedent's life insurance policies typically pass outside of the estate directly to the named beneficiary.[83] With regard to the allegations of missing property, the evidence shows that the Estate property that Rodney and Cynthia claim are missing was either included on the supplemental Estate list provided during trial (such as silverware and some dolls),[84] or Charisse testified that Decedent had sold or given away the property prior to her death (such as the flea market stock and personal jewelry to family members).[85] And, Estate property may be appraised, but so long as the item's fair market value in the inventory is not subject to reasonable doubt (and keeping in mind the cost of

---

[82] As indicated by Mr. Baird, a personal representative frequently negotiates with the bank to reduce the amount owed. Trial Tr. 294:15-18. Once the final amount owed is determined and paid, then the claimant files a satisfaction to its claim against the Estate with the Register of Wills. Trial Tr. 294:18-20. It is anticipated that Charisse will try to negotiate with Wells Fargo Bank concerning the remaining car loan amount due.

[83] *See In re Est. of Bernstein*, 17 A.3d 1172, 1175, n. 7 (Del. Ch. 2011) ("Life insurance proceeds are not part of the testamentary estate, and therefore do not pass through the testamentary estate, unless made payable to the estate.") (citations omitted), *aff'd,* 31 A.3d 76 (Del. 2011) (TABLE); *In re Est. of Kelter*, 1994 WL 698634, at *5 (Del. Ch. Sept. 19, 1994) ("insurance policies . . . pass outside the estate directly to the named beneficiary"). Charisse testified that she was the named beneficiary on two of Decedent's life insurance policies and a cousin on another. Trial Tr. 26:19-27:8.

[84] *See* Est. Tr. Ex. J.

[85] Trial Tr. 205:4-11; Trial Tr. 206:10-22; Trial Tr. 208:6-14.

obtaining an appraisal as compared to the value of the property in dispute), there is no requirement that appraisals be obtained for all property.[86]

In summary, I recommend that the Court grant the exception regarding Decedent's coin collection and require that Schedule E of the Inventory be amended to include the coin collection as an Estate asset prior to the closing of the Estate (through the final accounting/amendment to the Inventory). I recommend that the Court deny the remaining exceptions to the Inventory.

## B. Exceptions to the First Accounting

1. <u>Breach of Fiduciary Duty</u>: In their exceptions to the First Accounting, Rodney and Cynthia claim that Charisse acted in her own self-interest as personal representative and request that, because of her self-dealing, Charisse be required to produce all documents and receipts related to Estate matters.[87] "The [personal representative]'s duty is to carry out the wishes of the decedent as expressed in the will."[88] "The Personal Representative has a duty of loyalty requiring [her] to act, at all times, in the best interests of the estate."[89] And, "[t]he Personal Representative

---

[86] *See* 12 *Del. C.* §1904 ("[t]he personal representative **may** employ 1 or more qualified and disinterested appraisers to assist in ascertaining the fair market value as of the date of the decedent's death of any asset the value of which may be subject to reasonable doubt.") (emphasis added).

[87] ROW Action, D.I. 23, at 3.

[88] *In re Est. of Reichert*, 2001 WL 1398579, at *2 (Del. Ch. Oct. 31, 2001).

[89] *Est. of Chambers*, 2020 WL 3173032, at *2 (Del. Ch. June 12, 2020) (internal quotation marks and citation omitted).

19

is held only to a standard of 'ordinary care, prudence, skill and diligence' [in her] duties."[90] There is no evidence of self-dealing by Charisse, or that she has failed to act with ordinary care, prudence, skill and diligence in fulfilling her duties as personal representative. I find that she has provided sufficient supporting documentation of Estate matters.[91] Accordingly, I do not find that Charisse has breached her fiduciary duty.

2. <u>Funeral Expenses</u>: The First Accounting lists $9,218.40 in funeral expenses as an obligation of the Estate.[92] Rodney and Cynthia contest the inclusion of the funeral expenses as an obligation of the Estate in the First Accounting and assert that there were life insurance policies to pay those expenses.[93] Charisse responds that she paid Decedent's funeral expenses from her personal funds and seeks reimbursement from the Estate for those expenditures.[94] The Will provides that Decedent's funeral expenses "shall be paid out of my residuary estate, without apportionment and with no right of reimbursement from any recipient of any such

---

[90] *Id.* (citations omitted).

[91] *See* Est. Tr. Exs. H-J.

[92] Est. Tr. Ex. C.

[93] ROW Action, D.I. 23; *Id.*, D.I. 27, at 5.

[94] *Id.*, D.I. 25. Charisse testified that she used funds from two of Decedent's life insurance policies payable to her as the named beneficiary to pay the funeral expenses. Trial Tr. 37:7-22; Trial Tr. 42:14-23. Charisse assigned $6,300.00, out of a total of $6,355.68, in one of the policy's proceeds to the funeral home for Decedent's funeral expenses. *See* Est. Tr. Ex. F.

property."[95]   It obligates the Estate to pay Decedent's funeral expenses from the residuary estate and protects recipients of Estate property by preventing them from being required to pay any of the funeral expenses or to return Estate property they have already received to pay those costs.[96]   In addition, funeral expenses are statutorily authorized claims against an estate.[97]   I find that Decedent's funeral expenses are properly charged against the Estate and that Charisse may seek reimbursement from the Estate for personal funds she spent on funeral expenses.  I recommend that the Court deny this exception.

3. Decedent's Car:  The First Accounting lists the $8,000.00 value of the Decedent's car included on the Inventory as a debt against the Estate because the car was surrendered.[98]   Rodney and Cynthia argue that the Decedent's car was valued as an asset on the Inventory and its return was Charisse's decision and should not be

---

[95] Est. Tr. Ex. A, ¶ 1.

[96] Rodney alleges that the language "with no right of reimbursement from any recipient of any such property" precludes reimbursement to Charisse for her payment of the funeral expenses. Trial Tr. 58:15-20.  For that interpretation to apply, the prohibition on reimbursement would need to be "to" any property recipient, not "from" them.

[97] 12 *Del. C.* §2105(2). *See also In re Est. of Sexton*, 2007 WL 2303915, at *4 (Del. Ch. Aug. 8, 2007) (alterations in original) ("The funeral of a deceased person is a work of necessity, as well as of charity and piety.  It is the duty of an executor or administrator to bury the deceased in a manner suitable to his degree and the circumstances of the estate; and if this duty is performed by the personal representative, . . . the law implies a promise of reimbursement out of the assets of the estate for the reasonable expenses incurred and paid[.]" (quoting *Smolka v. James T. Chandler & Son, Inc.,* 20 A.2d 131, 133-34 (Del. 1941))).

[98] Est. Tr. Ex. C.

assessed against the Estate.[99]   Charisse explains that the amount of the car loan exceeded its value when it was surrendered, leaving an additional $4,444.17 due on the loan.[100]   In the First Accounting, she included the car's value as an $8,000.00 Estate debt.[101]   As discussed related to exceptions to the Inventory above, when the car was surrendered, it was no longer an Estate asset and the First Accounting excluded the value of the car from consideration as an Estate asset.  I recommend that the Court deny this exception.

4.  <u>Attorney's fees</u>:  The First Accounting includes $12,088.00 in attorney's fees as expenses of the Estate.[102]  Rodney and Cynthia claim that the attorney's fees should not be charged to the Estate because the Estate attorney acted in an untimely manner, was hired by Charisse without their approval, and worked on Charisse's behalf.[103]  Charisse replies that she is not obligated to consult with the beneficiaries before hiring an attorney, and that she only hired a lawyer after Rodney and Cynthia filed the Petition for Accounting, and the legal fees were incurred because of Rodney and Cynthia's "frivolous" filings.[104]   Since exceptions were filed regarding

---

[99] ROW Action, D.I. 23, at 3.

[100] *Id.*, D.I. 25.

[101] Est. Tr. Ex. C.

[102] *Id.*

[103] ROW Action, D.I. 23.

[104] *Id.*, D.I. 25.

additional attorney's fees included in the Second Accounting, all attorney's fees

exceptions are addressed in the exceptions to the Second Accounting below.[105]

## C. Exceptions to the Second Accounting[106]

1. Attorney's fees:  The Second Accounting includes $13,156.00 in additional

attorney's fees as expenses of the Estate.[107] In her exceptions, Cynthia claims that

Charisse hired the Estate attorney for her own interests, and that the fees are

unreasonable.[108]  Charisse asserts that the substantial legal fees are the result of

---

[105] Est. Tr. Ex. D.

[106] Kelli filed exceptions to the Second Accounting but failed to appear at trial to pursue her exceptions.  Kelli's exceptions questioned: (1) Decedent's funeral expenses, (2) value of Decedent's car, (3) attorney's fees, (4) missing monies in Decedent's bank accounts, and (5) cable and electric charges to the Estate. ROW Action, D.I. 28.  With regard to Kelli's exceptions regarding funeral expenses and the value of Decedent's car, those expenses were addressed in the First Accounting. Est. Tr. Ex. C.  Exceptions to those expenses needed to have been filed within three months of the date that notice of the First Accounting was sent out. *See* 12 *Del. C.* §2302(b).  Kelli filed her exceptions more than a year after notices were sent out, so those exceptions were untimely.  Similar exceptions, however, are considered, and denied, as part of Rodney and Cynthia's exceptions to the First Accounting.  Exceptions regarding attorney's fees in the First and Second Accountings are addressed in this report, and are denied.  Finally, Kelli's claims objecting to payment of cable and electric charges by the Estate were also untimely, but are addressed in this report as a part of Cynthia's similar (and also untimely) exceptions to the Second Accounting.  Accordingly, even if Kelli had appeared to pursue her exceptions at trial, they would have been denied.

[107] Est. Tr. Ex. D.

[108] ROW Action, D.I. 27, at 2.  Cynthia also contends that the Court denied Charisse's attorney's fees in the September 12, 2019 hearing so her attorney's fees cannot be included as Estate expenses in the accountings. *Id.*, at 1.   At that hearing, the Court did not declare that Charisse's attorney's fees would not be paid by the Estate but, instead, declined to award attorney's fees to Charisse (to be paid by Rodney and Cynthia) related to the motions at issue. Pet. for Acct., D.I. 36.  Because attorney's fees were included in the First Accounting, Cynthia also disagrees with the Second Accounting's calculation of $5,551.21 as the total probate assets remaining after the First Accounting. ROW Action, D.I. 27, at

23

Rodney and Cynthia's numerous "frivolous" filings and are an "unfortunate" expense of the Estate.[109]

The general rule is that "fees paid to the attorney for the personal representative are considered an expense of the estate."[110] "The rational[e] behind this rule is that the personal representative and his or her attorney is providing a service to the estate and its beneficiaries by properly and efficiently administering the estate."[111] If a personal representative breaches her fiduciary duty, she may be found to be acting in her own best interest rather than to benefit the estate, and ordered to pay her own attorney's fees.[112] As discussed above, there is no evidence that Charisse breached her fiduciary duty or that the attorney's services were not benefitting the Estate. It is appropriate that Charisse's attorney's fees be charged to the Estate. However, "the Personal Representative still bears the burden of proving the attorneys' fees and expenses were relevant, reasonable, and timely."[113]

---

1. As stated on the ROW accounting form, the figure listed on the Second Accounting as total probate assets after First Accounting must match the ending balance of assets on the First Accounting, and $5,551.21 complies with that requirement, since that is the amount listed as the ending balance on the First Accounting. Est. Tr. Exs. C, D.

[109] ROW Action, D.I. 29, at 2.

[110] *Est. of Chambers*, 2020 WL 3173032, at *3 (Del. Ch. June 12, 2020) (citing *In re Est. of Pusey*, 1997 WL 311503, at *3 (Del. Ch. May 23, 1997)).

[111] *Id.*

[112] *In re Est. of Rose*, 2019 WL 2996887, at *7 (Del. Ch. July 9, 2019).

[113] *Est. of Chambers*, 2020 WL 3173032, at *3.

At first blush, the attorney's fees charged to the Estate, including related to the First Accounting, are very high when considered in relation to the size of the Estate.[114] The difficulty is that there have been multiple, highly litigious disputes involving the Estate, most of which were not initiated by the Estate. The disputes have extended over a three-year period. Except for the Petition to Sell Property and three motions, the actions and the multiple motions were filed by Charisse's siblings.[115] Charisse's attorney's fees were incurred, in large part, responding to those filings and related to regular estate administration duties. The attorney's fees and costs were relevant to Estate administration and incurred by Charisse in her fiduciary capacity. The attorney provided a service to the Estate by permitting its administration to proceed. It would be inequitable to assess attorney's fees against Charisse when those fees were incurred in furtherance of her duties as personal representative. Further, Charisse has presented sufficient documentation of the attorney's fees and costs incurred.[116] Neither Rodney nor Cynthia pointed to any

---

[114] The Inventory shows the Estate's total value as $84,650.00, including $50,000.00 in real estate and $34,650.00 in the personal estate. *See* ROW Action, D.I. 3.

[115] In the Petition for Accounting action, the Estate filed a September 25, 2018 motion to strike Rodney and Cynthia's reply in opposition to the answer, which was denied; an August 9, 2018 motion to compel discovery, which was granted; and an October 30, 2020 motion for consolidation, which was granted. *See* Pet. for Acct., D.I. 10; *Id.*, D.I. 34; *Id.*, D.I. 48.

[116] I recognize the Estate attorney and/or paralegal spent significant amounts of time on preparing and responding to various motions and other aspects of the litigation. *See* Pet. for Acct., D.I. 65. I note that the attorney discounted his hourly rate from $350.00 to $245.00, and his paralegal's hourly rate from $100.00 to $70.00. *Id.* To determine the

25

specific attorney's fees that were unnecessary or unreasonable. Attorney's fees and costs included in the First and Second Accountings were properly charged to the estate. I recommend that the Court deny these exceptions.

2. Cable and electric charges: Cynthia, in her exceptions to the Second Accounting, objected to the cable and electric charges included as debts to the Estate since Charisse resided with Decedent on the Property.[117] Charges of $195.07 (cable) and $129.27 (electric) were included as debts of the Estate in the First Accounting.[118] Although this exception is untimely,[119] for purposes of completeness, I address it. Charisse testified that the cable and electric charges were incurred during Decedent's lifetime and that she has paid all subsequent house-related costs personally.[120] I find these charges are properly paid by the Estate and recommend that the Court deny this exception.

---

reasonableness of amounts of attorney's fees sought, the Court is not required "to assess independently whether counsel appropriately pursued and charged for a particular motion, line of argument, area of discovery, or other litigation tactic." *Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 997 (Del. Ch. 2012). "For a Court to second-guess, on a hindsight basis, an attorney's judgment . . . is hazardous and should whenever possible be avoided." *Id.* (omission in original) (citation omitted).

[117] ROW Action, D.I. 27, at 5.

[118] Est. Tr. Ex. C.

[119] This exception was filed on July 21, 2020, more than a year after notice of the filing of the First Accounting was sent out on May 31, 2019. Est. Tr. Ex. C. Exceptions need to be filed within three months of the date that notice is sent out. 12 *Del. C.* §2302(b).

[120] Trial Tr. 36:1-10.

3. <u>Other</u>: Cynthia disagrees with the Second Accounting's calculation of $5,551.21 as the total probate assets remaining after the First Accounting.[121] The figure on the Second Accounting listed as "Total Probate Assets after First Accounting" must match the ending balance of assets on the First Accounting and $5,551.21 is the amount listed as the ending balance on the First Accounting.[122]

And Cynthia questions the authenticity of the Will.[123] Charisse responds that any claim regarding the validity of the Will is untimely, since the exceptions were filed on July 21, 2020 and the Will was admitted to probate on April 13, 2018.[124] Delaware law provides that a will contest must be filed within six months after the Will was admitted to probate, so Cynthia's claim regarding the Will's validity is untimely and cannot be considered here.[125]

Cynthia also alleges Decedent was subject to undue influence by Charisse, claiming Decedent was missing "thousands of dollars from her back accounts" after

---

[121] ROW Action, D.I. 27, at 1.

[122] Est. Tr. Exs. C, D.

[123] ROW Action, D.I. 27, at 5.

[124] *Id.*, D.I. 29, at 3.

[125] *See* 12 *Del. C.* §1309(a); *Moore v. Graybeal*, 1989 WL 17430, at *4 (Del. Ch. Feb. 24, 1989), ("[S]tatutes [limiting the time for challenging a will] are strictly construed.") *aff'd,* 567 A.2d 422 (Del. 1989) (TABLE). Further, since the Will's validity was not addressed as a part of the Second Accounting, such a claim is not properly brought as an exception to an accounting. *See* 12 *Del. C.* §2302(d).

Charisse moved in with Decedent.[126]  Charisse denies that she exerted undue influence over Decedent or that Decedent was missing money because of her.[127]  It is not clear if Cynthia's undue influence claim relates to specific actions taken by Decedent.  However, claims challenging *inter vivos* gifting or testamentary capacity because of undue influence are evaluated based upon: "(1) the susceptibility of the donor [or testator] to undue influence, (2) the opportunity to exert undue influence, (3) disposition or motive to do so for an improper purpose, (4) actual exertion of undue influence, and (5) a result demonstrating its effect."[128]  Here, there is no evidence to support Cynthia's undue influence claim.  It is undisputed that Decedent wanted to help Charisse.[129]  Charisse responds that she also wanted to help Decedent by providing support and companionship.[130]  Further, a claim of undue influence is not properly brought as an exception to the Second Accounting.[131]  I recommend that the Court deny these exceptions.

## D. Petition for Accurate Accounting

---

[126] ROW Action, D.I. 27, at 6.

[127] *Id.*, D.I. 29, at 3-4.

[128] *Minieri v. Bennett*, 2013 WL 6113911, at *12 (Del. Ch. Nov. 13, 2013); *see also In re Estate of W.*, 522 A.2d 1256, 1264 (Del. 1987); *In re Will of Cauffiel*, 2009 WL 5247495, at *7 (Del. Ch. Dec. 31, 2009).

[129] ROW Action, D.I. 27, at 6; *Id.*, D.I. 29, at 4.

[130] *Id.*, D.I. 29, at 4.

[131] The Second Accounting does not address, or refer to, any undue influence claim. *See* 12 *Del. C.* §2302(d).

Rodney and Cynthia filed the Petition for Accounting on June 27, 2018.[132] They claim Charisse failed in her duties as personal representative because she failed to provide information to the siblings, including death certificates or copies of the Will, and information about Decedent's bank accounts and balances.[133] They also allege she failed to coordinate Decedent's burial date with them, call them personally before posting death and burial information online, obtain an appraisal of the Property, and produce the Will in compliance with Delaware law.[134] In addition, they contend Charisse submitted an inaccurate and incomplete inventory list to them and failed to collect and secure all of Decedent's property.[135] Charisse denies their claims and asserts she secured Decedent's property to the best of her ability.[136]

With regard to their claim that Charisse failed to provide information to them, Charisse had no legal obligation as personal representative to provide copies of Decedent's death certificate or the Will to the siblings, coordinate Decedent's burial date with them, call them personally before posting death and burial information online, or provide information about Decedent's bank accounts that were not Estate

---

[132] Pet. for Acct., D.I. 1.

[133] *Id*., at 2-3.

[134] *Id*.

[135] *Id*.

[136] *Id*., D.I. 8, ¶ 5. Charisse asserts, however, that some of Decedent's personal property was removed from Decedent's residence by Cynthia and Kelli. *Id*., ¶ 6.

assets to them.[137]  Rodney and Cynthia's claim that Charisse failed to produce the

Will in compliance with Delaware law was addressed previously by the Court.[138]

The law of the case applies to bar reconsideration of that claim.[139]  Finally, Charisse

filed the First and Second Accountings on a timely basis and there is no evidence

that she breached her fiduciary duty related to filing those accountings for the

Estate.[140]  Exceptions were filed related to the Inventory and First and Second

Accountings and have been addressed.  Accordingly, I recommend that the Court

deny the Petition for Accounting.

## E. Petition to Sell Real Estate to Pay Debts

Charisse seeks to sell the Property to pay Estate debts under 12 *Del. C.* §2701,

claiming that Estate debts exceed its assets.[141]  She calculates the Estate personal

---

[137] Charisse stated that she provided information about Decedent's burial to most of the siblings (with the belief that they would tell others) and that she provided copies of the Will to all siblings who requested a copy. *Id*., ¶ 5.

[138] It was addressed when the Court denied Rodney and Cynthia's motion for production of the Will. *Id*., D.I. 36.

[139] *Frederick-Conaway v. Baird*, 159 A.3d 285, 296 (Del. 2017) (citation omitted) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation.").

[140] Delaware law requires that an accounting be filed within one year from the issuance of the letters testamentary. 12 *Del. C.* §2301(a).  The First Accounting was not due when the Petition for Accounting was filed within six months of Decedent's death. Pet. for Acct., D.I. 8, ¶ 10.  Rodney and Cynthia's request for proof of fire insurance on the Property is not addressed through a petition for an accounting, although Charisse testified that she has personally paid all carrying costs on the house since Decedent's death. Trial Tr. 36:7-11.

[141] Pet. to Sell Real Est., D.I. 1.

assets as $27,393.05 and the Estate debts as $43,263.01, resulting in a deficiency necessitating the sale of the Property.[142] Charisse also claims that she should be paid for her surrender of her life estate out of the proceeds remaining after Estate debts have been paid.[143] Rodney moved to reject the Petition to Sell Property, claiming that monies should be available since the Will states that expenses will be paid from the residuary estate, and asking that the attorney's fees be denied because they are solely related to Charisse's defense for her misconduct.[144] Cynthia filed an answer to the Petition to Sell Property, claiming that sufficient Estate monies should have been available for the debts, the attorney's fees were incurred for Charisse's benefit, and Decedent told them that funeral expenses would be paid from her life insurance policies.[145] She denies that Charisse should be compensated for her life estate interest.[146]

---

[142] *Id.*, ¶¶ 6, 12, 13.

[143] *Id.*, ¶ 18.

[144] *Id.*, D.I. 6. Rodney also claims that the Property was jointly owned by Decedent and Dennis at her death. That argument has been addressed previously. *Id.* Rodney also cites to federal tax laws indicating that the value of the gross estate includes all property owned by Decedent at her death and considers property transfers made by Decedent up to three years prior to her death. *Id.* Federal tax laws do not affect consideration of Estate assets for purposes of deciding whether Decedent's personal estate is insufficient to pay the debts.

[145] *Id.*, D.I. 9.

[146] *Id.*

The Inventory shows probate assets valued at $34,650.00, including the mobile home ($20,000.00) and the car ($8,000.00).[147]  Additional refunds totaling $743.05 were added to the Estate assets, increasing the value to $35,393.05.[148]  When the value of the car is subtracted out, the remaining probate assets are valued at $27,393.05.  As discussed above, adding in the $823.10 value of Decedent's coin collection results in probate assets totaling approximately $28,216.15.[149]  Rodney and Cynthia have offered no evidence to support their claims that additional monies should be available in the Estate to pay debts.[150]

At the time the Petition to Sell Property was filed, Estate debts totaled $43,263.01, including $343.44 in unpaid bills (cable, cell phone, electric) at Decedent's death; a $4,444.17 claim filed against the Estate by Wells Fargo for remaining monies owed on the car loan (after the car was surrendered); $9,218.40

---

[147] ROW Action, D.I. 3.

[148] Est. Tr. Ex. C.  There were two Delaware Electric Cooperative refunds of $654.19 and $88.86 that were received by the Estate. *Id.*

[149] Pet. to Sell Real Est., D.I. 24.

[150] I find Cynthia's assertion that Decedent intended for her life insurance proceeds to be used for funeral expenses unpersuasive. *See id.*, D.I. 9, ¶ 10.  Her assertion is contrary to the Will, which directs that Decedent's funeral expenses be paid from her residuary estate. Est. Tr. Ex. A, ¶ 1.  In addition, Decedent's life insurance policies named Charisse and another relative as beneficiaries, and not the Estate. *See* n. 81 *supra*.

32

for funeral expenses; $152.00 in administrative expenses; and $29,105.00 in attorney's fees and costs through September 30, 2020.[151]

I find no basis for Rodney and Cynthia's argument that the attorney's fees were incurred solely for Charisse's benefit. As discussed above, attorney's fees for the personal representative were incurred related to the litigation and the administration of the estate. They are considered an Estate expense and benefitted the Estate. Charisse has presented sufficient documentation of the attorney's fees and costs incurred.[152] There were no allegations that specific attorney's fees were unnecessary or unreasonable.

Under Delaware law, when it appears "there is a deficiency of personal estate for the payment of the decedent's debts," the Court of Chancery can order the sale of the decedent's real estate to make up the deficiency.[153] The personal representative must show "that the personal estate of the decedent is insufficient to

---

[151] *See* Pet. to Sell Real Est., D.I. 1. There is a possibility that the $4,444.17 claim on the car loan may be reduced through negotiation. Attorney's fees have continued to increase and, as of May 20, 2021, totaled $42,952.00, and $1,798.53 in related costs. Pet. for Acct., D.I. 65.

[152] Pet. for Acct., D.I. 65; *see* n. 114 *supra.*

[153] 12 *Del. C.* §2704; *see also* 12 *Del. C.* §2701(a) ("When the personal estate of a decedent is not sufficient to pay the decedent's debts, the decedent's executor [may petition the Court to sell] . . . any real estate of the decedent.").

pay his debts."[154]  The decision "[w]hether and on what grounds to permit an executor to sell real estate is left to the discretion of the court."[155]

Here, given the amount of valid debts against the Estate, even if Charisse sells all of Decedent's personal property (including the mobile home), it appears that Estate debts will not be satisfied and the Property will need to be sold to pay debts. However, since selling the mobile home together with the Property offers the most practical solution and maximizes the value to be obtained for the Estate, I recommend that the Court grant the Petition to Sell Property and order that the mobile home and the Property be sold together.

The final issue concerns how to distribute proceeds from the sale of the mobile home and the Property.  Since personal property is used to pay off Decedent's debts prior to using funds from the sale of the real property, the sale proceeds representing the value of the mobile home will be applied first to pay outstanding Estate debts.[156] Sale proceeds from the Property (the real property) would be applied to any residual Estate debts.

---

[154] *In re Est. of Farren*, 2015 WL 3797432, at *4 (Del. Ch. June 18, 2015).

[155] *In re Est. of Farren*, 131 A.3d 817, 838 (Del. Ch. 2016).

[156] *See* 12 *Del. C.* §§2701, 2704.  Although unlikely, if there are sale proceeds representing the value of the mobile home remaining after Estate debts are paid, those funds would be distributed equally among Rodney, Cynthia, Kelli, and Charisse, consistent with the Will's residuary clause. *See* Est. Tr. Ex. A, ¶ 5.

Charisse seeks to be paid for her life estate interest on the Property and to receive 74.491% of the remaining sale proceeds, with the three other heirs dividing 25.509% of the proceeds equally.[157] Cynthia contends that compensating Charisse for her life estate interest conflicts with the Will since it provides that, if Charisse sells the Property, she must share the proceeds equally with Rodney, Cynthia, and Kelli.[158]

Under the Will, Charisse received a life estate in the Property.[159] The Will allows Charisse to "reside in the property as long as she wishes" with the caveat that if she "sells the real property, she must share any proceeds equally" with Rodney, Cynthia, and Kelli.[160] In contrast, 12 *Del. C.* §2711 ("Section 2711") provides that, after a decedent's real property has been sold to pay her debts, "if there is any surplus of the sale, after paying all the debts, it shall belong to the person to whom the premises sold belonged at the time of the sale, who shall have the same proportion, quantity and manner of interest in the surplus, as the person had in the premises sold."[161] In other words, the sale proceeds from property sold to pay decedent's

---

[157] Pet. to Sell Real Est., D.I. 1, ¶¶ 18-20. *See* Est. Tr. Ex. O (Charisse is 60 years old so her life estate is valued at 74.491% and the remainder interest at 25.509%).

[158] Pet. to Sell Real Est., D.I. 9.

[159] Est. Tr. Ex. A, ¶ 2.

[160] *Id.*

[161] 12 *Del. C.* §2711.

debts under Section 2711 are distributed according to the "proportion, quantity and manner of interest" that the owner had in the real property at the time of the sale.[162]

The question is whether Charisse is selling the property under the terms of the Will such that the proceeds are shared equally among the beneficiaries, or whether the distribution of the sale proceeds are controlled by Section 2711, which would compensate Charisse for the life interest she held in the Property at the time the Property is sold. Charisse argues that she is not choosing to sell the Property personally as provided by the Will, but is being forced to sell the Property as personal representative in order to pay Estate debts.[163] As a consequence, she is losing the value of her life interest. I find Charisse's arguments persuasive. She is not making a personal choice to sell the Property because she no longer wishes to live on the Property, but is doing so in furtherance of her duties as personal representative. Therefore, I find Section 2711 controls. Charisse shall be paid for her life interest in the Property from the proceeds from the sale of the Property leftover after Estate debts are paid. I recommend that the Court order that Charisse receive 74.491% of any sale proceeds from the Property remaining after all Estate debts have been paid, and Rodney, Cynthia, and Kelli divide equally 25.509% of the proceeds.

---

[162] *Id. See also In re Harris' Estate*, 44 A.2d 18 (Del. Orph. 1945) (treating surplus proceeds remaining from land sold to pay estate debts "as realty as to those who . . . hold the title) (decided under an earlier codification of 12 *Del. C.* §2711).

[163] Trial Tr. 336:4-8.

## III. Conclusion

For the reasons set forth above, I recommend that the Court grant the exception to the Inventory regarding Decedent's coin collection and require that Schedule E the Inventory be amended to include the coin collection as an Estate asset prior to the closing of the Estate (through the final accounting or an amendment to the Inventory). I recommend that the Court deny the remaining exceptions to the Inventory. Further, I recommend that the Court deny the exceptions to the First and Second Accountings, and the Petition for an Accurate Accounting. Finally, I recommend that the Court grant the Petition to Sell Real Estate to Pay Debts, and order that the mobile home and the real property located at 3514 Irish Hill Road, Magnolia, Delaware be sold together. Proceeds from the sale of the mobile home shall be applied first to Estate debts and proceeds from the sale of the real property used to pay any remaining Estate debts. Charisse Stanley shall receive the proportion of sale proceeds from the real property leftover after all Estate debts have been paid that represents her life interest in the real property, or 74.491% of the proceeds. The rest, or 25.509%, shall be divided equally among Rodney Kirk, Cynthia Kirk, and Kelli Walton. This is a final report and exceptions may be taken under Court of Chancery Rule 144.